LAMBORN & CO. et al. v. UNITED STATES.

No. 45333.

Court of Claims.

May 6, 1946.

John W. Burke, Jr., of New York City, (Lamar Hardy and Alfred C. B. McNevin, both of New York City, on the brief), for plaintiffs.

William A. Stern, II, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and MADDEN, JONES, WHITAKER, and LITTLETON, Judges.

LITTLETON, Judge.

The special jurisdictional act under which this suit was brought was approved October 14, 1940, 54 Stat. 1389, and provides as follows:

"That the Court of Claims of the United States be, and hereby is, given jurisdiction to hear and determine the claim, together with interest thereon, of Lamborn and Company against the United States for alleged loss and damage suffered by the said Lamborn and Company, and which arises

out of certain transactions involving the purchase of two thousand tons of sugar in the Republic of Argentina on and between May 25, 1920, and June 15, 1920, and the importation of the said sugar into the United States, pursuant to the representations and requests of the Department of Justice of the United States; and to enter such decree or judgment against the United States for such loss and damage as equity and justice shall require.

"Sec. 2. In the proceedings upon such claim before the Court of Claims, the United States shall not avail itself of the defense that the Department of Justice of the United States acted without legal authority in making representations or requests or issuing directions or fixing restrictions with regard to the purchase, importation, or disposition of such sugar.

"Sec. 3. Suit upon such claim may be instituted at any time within six months after the date of enactment of this Act, notwithstanding the lapse of time, laches, or any statute of limitations. Proceedings for the determination of such claim and appeals from, and payment of, any judgment thereon shall be in the same manner as in the case of claims over which such court has jurisdiction under section 145 of the Judicial Code, as amended."

■■■ The plaintiff, Lamborn and Company, is a New York partnership in dissolution, and the plaintiffs, Charles C. Riggs, George H. Logan, N. Nelson Keen, Clarence G. Troup, Karl Lindgren, and B. Wheeler Dyer, are now the sole surviving partners. Gerard P. Tameling, one of the original surviving partners, died after this suit was instituted. The partnership dissolved in 1923; however it did not terminate under the New York law but continues until its business and affairs are wound up and completed by the partners, or by those surviving. The surviving partners are the proper parties to institute and prosecute a cause of action accruing to a partnership during its existence. Pagan et al. v. Sparks et al., 18 Fed.Cas. page 976, No. 10,659; Daby v. Ericsson, 45 N.Y. 786.

Defendant's first contention is that the special jurisdictional act above quoted does not by its language or intention admit liability for such loss as plaintiff may have sustained in 1920 through the importation and sale of sugar at the request and upon the representations of the Department of Justice; that such act only waives certain defenses which the Government might otherwise interpose and grants plaintiff the right to sue on the basis of whatever legal or equitable claim it may be able to establish, as distinguished from any moral claim or right.

Defendant further contends that under the facts and circumstances plaintiff has no legal or equitable claim within the meaning of the act. In addition to these contentions defendant insists that plaintiff did not sustain a loss of $530,060.21 and that it has not satisfactorily established by sufficient competent evidence the correct amount of the loss, if any, which it may have sustained on the importation and sale of the 2,000 tons of sugar in question.

Plaintiff contends that since the jurisdictional act was enacted under the clear recognition and express statement by the Congressional Committees as set forth in their reports, that without such act there was no liability and that plaintiff had no legal claim against the United States, Congress intended to create a liability on the part of the United States conditioned upon plaintiff proving to the satisfaction of the court the prices and costs at which it purchased, imported, and disposed of the sugar in question, and that it sustained a loss as the direct result of its compliance with the requests and representations of the authorized officials of the Department of Justice.

Lamborn and Company was, among other things, engaged in the business of importing, exporting and merchandising of sugar on its own account and as brokers. Plaintiff carried on this business under a license issued by the U. S. Food Administrator under the Food Control Act (Lever Act) of August 10, 1917, 40 Stat. 276. During 1920 when the transactions involved in this case arose, the Attorney General had complete control over the importation and disposition of sugar and in this connection the Attorney General exercised the power and authority formerly exercised by the Food Administrator under the Lever Act by virtue of the order of the

President on November 21, 1919, transferring such duties and authority to the Attorney General. In the early part of 1920 the sugar on the domestic market was scarce and market prices were very high. The scarcity and high prices had not been relieved by limiting profits and the prosecution of profiteers by the Department of Justice. The Attorney General had an investigation made and had statistics compiled from all available sources by representatives of the Food Administration and same to the conclusion that there was only a limited supply of sugar in the United States, and that this supply was rapidly dwindling and would soon become exhausted. Numerous complaints were being made by consumers and industrial users as to the scarcity of sugar. By May 1920 market prices for sugar had reached the peak of from 25 to 30 cents a pound, which was generally attributed to the scarcity of sugar, coupled with some speculation. The Attorney General, after consultation with his assistants and officials engaged in handling the sugar situation, decided upon a plan to obtain and secure, if possible, additional importations of large supplies of sugar at the earliest possible date by sugar importers and dealers from any and all available sources. Accordingly the Attorney General asked certain firms engaged in the business of importing and dealing in sugar to meet with him on May 21, 1920, to discuss the existing sugar situation. Pursuant to this request three of the partners of Lamborn and Company, Arthur H. Lamborn, Gerard P. Tameling, and B. Wheeler Dyer, met in Washington with Attorney General A. Mitchell Palmer and with representatives of other importers of sugar. The Attorney General stated to the importers that the United States was in a serious situation with respect to sugar; that the country's supply had declined to such an extent that there would soon be a complete lack of sugar, and that it was the duty of the sugar trade to supply this need and demand. He requested and urged the importers to "scour the world" for available supplies and to bring in the sugar. Further conferences were later had with the Attorney General's assistants and, as one of

them expressed it, "I put as must pressure on these men [importers] to import sugar as I felt I could rightfully do." The Attorney General was aware of and approved the action of his assistants in using every effort to secure the services of the importers in carrying out his plan to bring more sugar into the country. When the sugar situation had been discussed at the meeting with the Attorney General on May 21, 1920, the Attorney General at that time appointed an importers' committee, consisting of Lamborn and Co., and two other sugar importers, for the purpose of cooperating and working with the Department of Justice in ascertaining the available sugar supply throughout the world and to assist the Department by importing sugar to relieve the shortage in the United States and to lower existing prices to the consumers. At the meeting of May 21, the Attorney General informed the importers that any sugar imported must be distributed to those in present need, and reminded them that they would be limited to a profit of 1 cent a pound on sales to the wholesale trade.

It became known at this conference that there was probably a considerable surplus of refined sugar in Argentina but that the exportation thereof was then prohibited by an embargo imposed by the Argentine Government. The possibility of getting the embargo lifted, at least in part, and having some of this sugar imported as soon as possible was discussed by the Department of Justice officials with plaintiff and others.

Prior to the conference of May 21, plaintiff had, in the early spring of 1920, committed itself to what its partners considered a reasonable limit for the importation of large quantities of sugar from Java, Mauritius, India, Brazil, Czecho-Slovakia, and Hong Kong for shipment in the summer and fall of 1920. Plaintiff's partners had decided as a prudent business policy to make no further commitments for the importation of sugar until their outstanding obligations had been substantially discharged. Plaintiff was therefore reluctant at the conference of May 21 to undertake further sugar importations at the request of the Attorney General and, except for plaintiff's desire, based upon the Attorney

General's urgent appeal and representations, to aid him and the Government in relieving the serious shortage of sugar on the domestic market plaintiff would not have undertaken the importation of sugar at that time, as a business proposition, on its own initiative and at its own risk. During the conference with the Attorney General at the meeting of May 21, the plaintiff's partners, through Arthur H. Lamborn, objected to entering into the proposal program on the grounds that the risk involved in further importations was very great; that domestic prices were too high, and that there was likely to be a sudden break in prices. To this objection the Attorney General stated that the statistician of the Food Administration had made a thorough study of the World supply of sugar and from information obtained from various official sources was definitely convinced that there was not sufficient sugar coming into the United States to satisfy the demand and that there was no risk involved since the sugar imported would be consumed as fast as it could be brought in.

On May 22, the day following this conference with the Attorney General, as a result of efforts of the Justice and State Department, the Argentine Government, at the request of the President of the United States, lifted the embargo against exportation of 100,000 tons of refined sugar. Following this the Attorney General, acting through his assistants who were working with the committee appointed May 21, called another meeting of the committee of importers in order to induce them to get as much sugar as possible into this country and to accomplish this at the earliest possible date. At this meeting the Department of Justice "put as much pressure," as it could on the importers to import the sugar. While plaintiff had objected at the first meeting of May 21 that the risk of importing sugar at that time was too great because prices were too high and by the time the sugar could be brought in the market might break, at the second conference a few days later no one anticipated that there would be danger of a loss on the additional importations by reason of the Government's statistics, hereinabove mentioned,

which showed that there was a definite scarcity of sugar at that time, that such scarcity would continue into the fall and winter months, and that, as represented by the Department of Justice, "the price must naturally advance."

As a result of the conference and representations as above set forth plaintiff concluded to enter into the program proposed by the Government and to assist the Attorney General in relieving the existing sugar scarcity by importing sugar from Argentina for the reasons as stated by Arthur H. Lamborn on behalf of plaintiff and as set out in Senate Report No. 2179 and House Report No. 2262, 76th Congress, 3d session, on the jurisdictional act herein, as follows: " * * *. Ordinarily I would not have considered such a thing. but under the circumstances, Yes. We did not anticipate a loss. We believed that before we went to that meeting, and we believed subsequently, that the market was too high and, as I have said, left to our own initiative we would not have purchased that sugar, but when they not only spoke of their own statistical department but urged and practically implored us to bring in sugar, naturally, our mental attitude changed."

After an exchange of cables between plaintiff's New York and Buenos Aires offices, the plaintiff on May 24, 1920, purchased 1,000 long tons of Grade A granulated sugar from Moss & Co., of Buenos aires, for 21½ cents a pound, c.i.f. New York. Shortly thereafter the Attorney General's assistants held another meeeting with the importers' committee and plaintiff was urged by the Department to import more sugar from Argentina, and about June 7 plaintiff, through the same office. purchased an additional 1,000 tons of sugar from Portalis & Co., at 20 cents a pound, c.i.f. New York. These two thousand tons were shipped from Buenos Aires on the S. S. Balzac, which sailed June 25, 1920, and arrived in the port of New York on July 21, 1920. The evidence satisfactorily establishes that plaintiff purchased this sugar in Argentina for export therefrom at the lowest prices obtainable and, subsequently, sold it in the United States as soon as possible and at the highest prices obtainable (find-

ing 9). Plaintiff had available for sale in the United States 4,376,463 pounds of sugar. Before and by the time plaintiff's sugar reached New York plaintiff was able to make eleven contracts covering the sale of 1,094,797 pounds of sugar, delivery of which was tendered after arrival in New York. The purchasers under six of these contracts, covering 549,853 pounds, accepted delivery at the contract price and plaintiff made a profit of $601.27 on the sales of this amount. Five of the original buyers repudiated their contracts covering 544,944 pounds of sugar, because the domestic market price for sugar had crashed, and declined to accept the sugar. Plaintiff's importation was the first sugar to reach the United States under the Attorney General's plan and program, hereinbefore described. Plaintiff instituted proceedings for recovery on the five repudiated contracts and proceeded to resell this 544,944 pounds of sugar at the best price obtainable, which was 7.73 cents a pound. Plaintiff realized a net sum of $39,347.11 on settlements made on the repudiated contracts and a net sum of $38,016.51 on resale of the sugar. The total cost to plaintiff for the 544,944 pounds of sugar was $127,839.61 and the resulting net loss thereon was $50,475.99 (finding 14).

The remaining 1,069,552 pounds of sugar of the first 1,000 tons purchased for export on May 24, from Moss & Co., together with the entire amount of 2,212,097 pounds purchased from Portalis & Co., were consigned by plaintiff for sale through brokers at the best prices obtainable. This total amount of 3,281,649 pounds was sold at an average price of 8.4 cents a pound, or $276,114.18 (finding 15). Plaintiff incurred costs totaling $23,169 for storage, insurance, freight, brokerage and sundry items, and therefore realized a net sum of $252,-945.18 on these sales. This 3,281,649 pounds of sugar cost plaintiff $733,130.67, and plaintiff therefore sustained a net loss through these consignment sales of $480,-185.49.

Plaintiff's total net loss on the above-mentioned 2,000 tons of sugar imported and sold on the domestic market was $530,060.-21 (finding 16).

As set forth in finding 7 the Attorney General on June 24, 1920, the day before the S. S. Balzac left Buenos Aires, issued a press release which received wide publicity in newspapers throughout the country to the effect that the Government would aid in the distribution of sugar brought in from Argentina; that approximately 14,000 tons of sugar had been purchased by the American Trading Company and would soon arrive in New York and that upon its arrival the Department of Justice would begin the distribution thereof for essential uses including household needs. The press release referred to the fact that the 14,000 tons referred to had been purchased in Argentina by the American Trading Company at the direction of the Department of Justice; that the restrictions on the exportation of sugar had been lifted by the President of Argentina at the request of the President of the United States and on his assurance that the sugars to be purchased and exported from Argentina were for distribution under the direction of the Department of Justice. The publication of this press release had the immediate effect of lowering the prices of sugar in the domestic market. Thereafter the buying of sugar by the ultimate consumer diminished materially; merchants in many instances found themselves overstocked with sugar; the market broke, and prices rapidly declined. In the last part of June 1920 the market for sugar in the United States had collapsed.

The 2,000 tons of refined sugar imported by plaintiff, which was the first shipment to arrive in this country under the Government's plan, was insignificant compared to the large amounts of other importations from Argentina and other points under the plan and arrangement of the Attorney General, and the effect of plaintiff's importation on the domestic market price was negligible.

Certain arguments advanced by defendant concerning the loss claimed by plaintiff will be disposed of before discussing defendant's contention that plaintiff has no justiciable claim under the terms of the jurisdictional act.

It is argued that plaintiff has not satisfactorily proven its loss on the ground that there is evidence which indicates the probability that the S. S. Balzac may have brought in between 3,000 and 4,000 tons of sugar and plaintiff has accounted for only 2,000 tons. We find from an examination of the record that there was certain sugar on the Balzac consigned to firms other than plaintiff, but the documentary evidence herein establishes that plaintiff has accounted for every pound of sugar purchased by it in Argentina from Moss & Co. and Portalis & Co., and imported into this country on the S. S. Balzac.

Defendant further argues that at the time plaintiff purchased its sugar in Argentina at 21½ and 20 cents a pound the market price there was 12.190 cents a pound, c.i.f. New York. However, the record shows that this claimed price was based upon the domestic market price for sugar in Buenos Aires which was fixed by governmental decree at about 10 cents a pound; the export market price of sugar was uncontrolled and the proof shows that the market price for sugar to be exported was more than double the domestic market price. The proof satisfactorily shows and we have found that plaintiff purchased the sugar in question for exportation at the best prices obtainable and that it paid the prices of 21½ and 20 cents a pound as claimed herein.

The next question is whether, under the facts and circumstances, plaintiff is entitled to recover its proven loss of $530,061.21, with interest, under the terms of the special jurisdictional act. We are of opinion that plaintiff has an equitable cause of action under the language and intention of the jurisdictional act and that, on the facts established, is entitled to judgment on such cause of action for the loss sustained with reasonable interest thereon.

The jurisdictional act hereinbefore quoted in full gives the court jurisdiction "to hear and determine the claim, together with interest thereon," of plaintiff arising out of the transactions involving the purchase and importation of sugar "pursuant to the representations and requests of the Department of Justice," with the further provision that the court shall have jurisdiction and authority "to enter such decree or judgment against the United States for such *loss and damage as equity and justice shall require.*" [Italics supplied.]

Section 2 of the act waives any defense which the Government might otherwise make that the Department of Justice "acted without legal authority in making representations or requests or issuing directions or fixing restrictions with regard to the purchase, importation, or disposition of such sugar."

Section 3 also waives any defense based on lapse of time, laches, or any statute of limitations.

It will be seen that this act is not written in the language usually employed in special jurisdictional acts which only grant the right to sue by waiving the statute of limitations and conferring jurisdiction upon the court to hear and determine any legal or equitable claim which the claimant may have, and to enter judgment against the United States thereon. Plaintiff does not and has never claimed that, apart from the jurisdictional act of October 14, 1940, the transactions involved gave rise to a cause of action under Section 145 of the Judicial Code, against the United States at common law or under any statute, and the record shows that Congress recognized when considering the special act that plaintiff had no legal claim against the Government. We cannot, therefore, agree with defendant, in view of the facts and the background and history of the present act, that the court is limited by the jurisdictional act in this case to the determination of whether plaintiff has a legal or equitable claim in the strict sense of that term as usually applied in courts of law and equity. Neither can we agree with plaintiff that the act completely concedes liability for such loss and damage as may have been sustained, leaving only the requirement that the amount of the loss be proven by plaintiff to the satisfaction of the court.

Our interpretation of the act is that when Congress wrote into it the provision giving the court jurisdiction and authority to enter such judgment for such loss and

damage as equity and justice shall require, it used the term "equity and justice" in its broad meaning rather than in the strict sense in which such term is understood and applied in equity jurisprudence. As given in Webster's International Dictionary the broad or large meaning of "equity" is "State or quality of being equal or fair; fairness in dealing", and such meaning of "justice" is "The principle of rectitude and just dealing of men with each other; also, conformity with it; integrity; rectitude; one of the cardinal virtues." From the facts and circumstances considered and discussed by the Claims Committees of Congress in connection with the passage of the special jurisdictional act it would appear that Congress intended that the phrase "as equity and justice shall require" should be given this large meaning.

■ We are, therefore, of opinion that Congress, in waiving the defense of lack of legal authority of the Department of Justice in making the representations and requests hereinbefore set forth, and in granting authority to enter such judgment upon the facts and circumstances as equity and justice shall require, intended to create a cause of action in favor of plaintiff where no cause of action existed against the United States from a strictly legal or equitable standpoint. United States v. Realty Co., 163 U.S. 427, 440-443, 16 S.Ct. 1120, 41 L.Ed. 215; Pope v. United States, 323 U.S. 1, 9, 65 S.Ct. 16, 89 L.Ed. 3. In the Realty Co. case the court, at page 443 of 163 U.S., at page 1126 of 16 S.Ct., 41 L.Ed. 215, said:

"The power to provide for claims upon the state, founded in equity and justice, has also been recognized as existing in the state governments. For example, in Guilford v. Chenango County, 13 N.Y. 143, it was held by the New York court of appeals that the legislature was not confined, in its appropriation of public moneys, to sums to be raised by taxation in favor of individuals to cases in which legal demands existed against the state, but that it could recognize claims founded in equity and justice, in the largest sense of these terms, or in gratitude, or in charity.

"Of course, the difference between the powers of the state legislatures and that of the Congress of the United States is not lost sight of, but is believed that, in relation to the power to recognize and to pay obligations resting only upon moral considerations or upon the general principles of right and justice, the federal congress stands upon a level with the state legislature."

In Garrett v. United States, 70 Ct.Cl. 304, we held that where Congress has authority to make an appropriation to pay a claim it has equal authority to create a cause of action against the United States therefor in favor of the claimant.

In Pope v. United States, supra, the court, at page 9 of 323 U.S., at page 21 of 65 S.Ct., 89 L.Ed. 3, said: "We perceive no constitutional obstacle to Congress' imposing on the Government a new obligation where there had been none before, * * *. The power of Congress to provide for the payment of debts, conferred by § 8 of Article I of the Constitution, is not restricted to payment of those obligations which are legally binding on the Government. It extends to the creation of such obligations in recognition of claims which are merely moral or honorary."

Plaintiff's claim for reimbursement for its claimed loss on these sugar transactions, along with the claims of others similarly situated but whose sugar had not left Argentina until after the market price in this country had collapsed, had been before Congress since sometime in 1921, and extended hearings and investigations thereon had been had before the Agricultural Committees. Under the Joint Resolution of February 9, 1923, 42 Stat. 1224, the United States Sugar Equalization Board paid two of the claimants a total of $2,482,476.33, and under the Joint Resolution of February 12, 1923, 42 Stat. 1226, the Board paid one other claimant the amount of $1,500,000. However, plaintiff's claim was not included among those which the Equalization Board was authorized to take over and settle.

■ Plaintiff continued to press its claim for relief before Congress. A bill was later introduced to confer jurisdiction on this court to hear and determine plaintiff's claim. As originally introduced this bill simply granted jurisdiction to hear and

determine the claim of plaintiff, notwithstanding the statute of limitations, for the loss and damage alleged to have been sustained and to enter judgment thereon. Under such an act the jurisdiction of the court would, of course, have been limited to the question of whether plaintiff had a legal or equitable claim under Section 145 of the Judicial Code, 28 U.S.C.A. § 250. Tillson v. United States, 100 U.S. 43, 25 L.Ed. 543; Sioux Tribe of Indians v. The United States, 97 Ct.Cl. 613, 663-666. However, the Claims Committee of the House of Representatives in its report of May 22, 1940 (No. 2262, 76th Congress, 3d session) on the bill amended Section 1 thereof so as to provide that the court should have jurisdiction "to enter such decree or judgment against the United States for such loss and damage as equity and justice shall require." This committee also inserted as Section 2 a provision that the evidence given and the records and papers filed in connection with any proceeding or hearing before any committee or subcommittee of Congress relating to plaintiff's claim, or the claims of others arising from similar transactions might be introduced before the court with the full force of depositions.

In reporting favorably upon the bill the House Claims Committee stated that the purpose of the bill was to give jurisdiction to hear and determine the claim of plaintiff for the loss and damage suffered by it in the transactions mentioned "pursuant to the representations and request of the Department of Justice of the United States and to render appropriate decree or judgment with interest." The report set forth at length the facts, substantially as established by the evidence herein, concerning plaintiff's transaction; quoted from the supporting testimony given on the claim by the Government officials, including Attorney General Palmer, and plaintiff; referred to the fact that the Government's public announcement of June 24, 1920, of impending importations of large quantities of sugar "broke the market," that "the market not only broke, but contrary to the Department of Justice's belief, opinion, and expectation, it broke rapidly and badly," and that as a result plaintiff sustained a loss through its efforts to aid and assist the Government in relieving the serious sugar situation which had theretofore existed. In addition the Committee said in part as follows:

"It must be remembered that Lamborn & Co. neither sought the business nor acted on its own desire or judgment in the entire matter. The Government initiated the plan and controlled it throughout. The Attorney General arranged for the Argentine embargo to be lifted; the Attorney General controlled the profit which might be made; the Attorney General dictated the channels of disposition and defined who were essential users; the Secretary of State refused permission to resell in the Argentine.

"Ample precedent is found in support of a special jurisdictional bill of the nature here under consideration. See Nock v. United States, 2 Ct.Cl. 451; Irby, Executor, v. United States, 57 Ct.Cl. 60, 63; Garrett v. United States, 70 Ct.Cl. 304; Alcock & Co. v. United States, 74 Ct.Cl. 308; Edwards v. United States, 79 Ct.Cl. 436.

"In Garrett v. United States, supra, the Court stated:

" 'The authority of Congress to create a liability on the part of the Government where no legal liability in fact exists, and to waive any legal defenses on the part of the Government has not been questioned by this court in any of the numerous cases it has considered under special jurisdictional acts. * * *

" 'If Congress has the power to pay these claimants by making an appropriation out of the Treasury, it seems it would undoubtedly have the authority to enact a statute recognizing such moral obligations, assume liability for its payment, and invest the court with authority to hear and adjudicate such claims and to enter judgment in favor of those to whom the money belongs. The claimants in either case would receive their money by virtue of an act of Congress.' "

The Committee Report further quoted from a letter from the Department of Justice recommending favorable action on plaintiff's claim, in part, as follows:

"These claims may, indeed, be termed debts of the United States, debts of that peculiar character which dictate relief at the hands of the Congress, as intimated by the Supreme Court in the following passage from United States v. Realty Co. [163 U.S. 427, 16 S.Ct. 1120, 1125, 41 L.Ed. 215]:

" 'What are the debts of the United States within the meaning of this constitutional provision (art. I, sec. 8)? It is conceded, and, indeed, it cannot be questioned, that the debts are not limited to those which are evidenced by some written obligation, or to those which are otherwise of a strictly legal character. The term "debts" includes those debts or claims which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a "debt" to an individual when his claim grows out of general principles of right and justice,—when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law.'

"As stated in another letter to you upon the subject, in view of the peculiar obligations upon the Government in this case, in which there appears to be general asquiescence, it seems to the Department, after a review of all the evidence, that the legislation should be passed."

In conclusion the Claims Committee of the House stated in its report on the jurisdictional act as follows:

"Two successive administrations of the Department of Justice most familiar with the facts and the situation as it existed originally, have found that the firms which helped bring relief from the sugar situation should be paid. Lamborn & Co., the first to assist the Government, and whose prompt action brought about the result desired by the Government, has not been paid. Certainly, Lamborn & Co., should be no less justly treated than those whose importations added nothing to the result which the action of Lamborn & Co. had already accomplished.

"The passage of time has not changed the nature of these services, the results obtained, or the losses incurred. The Government made a profit [in 1919] of some $39,000,000 by reason of its own sugar operations through the Sugar Equalization Board. Had the Argentine importations been negotiated directly by the Government, the loss would have fallen upon it. The fact that Lamborn & Co. substituted in the transaction for the Sugar Equalization Board at the insistence of the Attorney General should not deprive it of just reimbursement. No loss to the Government would result from these transactions in sugar, since the reimbursement of claimant would only serve slightly to offset the huge profit made by the Sugar Equalization Board from the Cuban crop purchase. The Government has paid other claimants. It is in no position, in good morals, to deny relief to the claimant who helped it first and most effectively."

The Claims Committee of the Senate in its favorable report on the bill (Report No. 2179, 76th Cong., 3d Session) struck out Section 2 as enacted by the House and inserted Section 2 as finally enacted; discussed the facts and favorable recommendations of the Attorney General on the claim; incorporated in its report the report of the Claims Committee of the House and, after referring to the two above-mentioned payments which had been made by the Government through the Sugar Equalization Board under the Joint Resolutions of February 9 and 12, 1923, supra, said: "The facts in the two cases just mentioned are parallel to those in the instant case. None of the three claimants had a legal claim against the Government. At the Justice Department's importunities claimant ordered and obtained shipment of Argentine sugar several weeks before any other company."

Although plaintiff could have refused to enter into the Attorney General's plan and program it was in such a position that it could not very well refuse, since it was in a position to use its funds and its organization to aid the Government, at its request, in relieving the sugar situation in which the Government was especially interested. The record shows that plaintiff was fearful

that the domestic market would collapse, as it did, if additional sugar should be imported, and argued at the meeting of May 21 that from the standpoint of good business further importations of sugar at that time was inadvisable. Plaintiff finally concluded, after much urging, to enter the program in order to aid the Attorney General in relieving the existing situation with which he was confronted. There is no question but that plaintiff did this, not on its own initiative, but only because of the requests and especially because of the representations of the Attorney General and his authorized assistants. These requests and representations and also plaintiff's action were based on the statistics prepared by or for the Attorney General which showed, as expressly represented by the Attorney General and his assistants, that the additional importations would not create a surplus; that there was a serious scarcity of sugar; that sugar imported would be consumed as fast as it could be brought in; that the scarcity of sugar would continue through the summer and into the fall; that the domestic market price would not materially decline, but that on the basis of the statistics the price would advance.

The Attorney General had no funds with which he could import and sell sugar through any Government agency, nor with which he could pay plaintiff or others in connection with importations and sales in the event they should sustain a loss. No one anticipated that there would be a loss. There was, therefore, no enforceable contract or agreement between the Attorney General, acting for the United States, and plaintiff. However, in view of the relationship of the parties, the circumstances under which plaintiff acted, the fact that it acted only at the urgent request and in reliance upon the representations of the Attorney General in order to aid and assist the Government in a situation in which plaintiff would not otherwise have been interested, as it expressly stated at the time, and in connection with which it would not have so acted on its own initiative, the Government, while not becoming legally bound to respond in event of loss, placed itself in such a situation that on the large

principles of equity and justice and fair dealing it ought to stand back of the official representations of the Attorney General as Food Administrator acting under the Food Control Act of August 10, 1917, and compensate plaintiff for the loss sustained by it in rendering to the Government the services which it considered so necessary at the time in the interest of the general public welfare. We think the cause of action which Congress intended to create under Section 1 of the jurisdictional act is one to be determined upon the basis of these considerations, and we have so adjudged it.

Upon the facts and circumstances hereinbefore set forth and under the terms of the jurisdictional act, as we interpret it in the light of its history, and as we think Congress intended that it should be interpreted, we are of the opinion that on principles of equity and justice plaintiff is entitled to judgment for its net loss of $530,-060.21, together with interest thereon.

The jurisdictional act provides for allowance of interest on the amount of the loss determined, but does not specify the rate of interest to be used. Interest was obviously allowed and intended by Congress as compensation in the event of recovery, for plaintiff's loss of use of the money which it lost on these sugar transactions. Therefore a rate of interest which is reasonable under all the circumstances should be used and applied. No issue was made as to the rate of interest which should be allowed and used. In the petition plaintiff asked judgment for the loss sustained "together with interest at 6 percent per annum upon the sums advanced and expended, as aforesaid, from the dates respectively advanced and expended, after giving due credit for all amounts received by Lamborn and Company and * * * for such other and further relief as equity and justice shall require and the Court may determine proper in the premises." The defendant does not mention the matter of interest in its brief.

Plaintiff was able to dispose of the 2,000 tons of sugar during the period August to December 1920. Its loss on the purchase, importation, and sale of the sugar was then determinable. Settlements with

purchasers who had repudiated their earlier purchase contracts were effected and the amounts subsequently paid by them, less expenses, were applied by plaintiff and have been applied herein in fixing the net amount of the loss sustained.

In view of all the facts and circumstances disclosed by the record we are of opinion that an average interest rate of five percentum per annum on the amount of the loss of $530,061.21 from January 1, 1921, when it was sustained, until paid, affords a fair and reasonable measure of compensation to plaintiff. Emil Olsson v. United States, 25 F.Supp. 495, 87 Ct.Cl. 642, 661; Marconi Wireless Telegraph Co. of America v. United States, 99 Ct.Cl. 1, 71; David McD. Shearer v. United States, 101 Ct.Cl. 196, 211, 221. Such interest at five percentum to and including May 6, 1946, is $671,838.30. The total of the principal and interest to date of judgment is $1,201,-899.51. Judgment is therefore entered in favor of plaintiff for $1,201,899.51, together with interest at 5 percentum per annum on $530,061.21 from May 6, 1946, until paid. It is so ordered.

WHITAKER, Judge, and WHALEY, Chief Justice, concur.

MADDEN and JONES, Judges, took no part in the decision of this case.