FAEGRE & BENSON, LLP, Respondent,

Eckland & Blando, LLP, Respondent,

v.

R & R INVESTORS, et al., interpleader defendants, Respondents,

Curtis Hogenson, et al., interpleader defendants, Appellants,

David Klug, et al., Interpleader Defendants,

and

R & R Investors I—UPA Partnership, et al., plaintiffs on counterclaims and cross-claims, Appellants,

v.

R & R Investors, et al., interpleader defendants and defendants on cross-claims, Respondents,

Faegre & Benson, LLP, interpleader plaintiff and defendant on counterclaims, Respondent,

Eckland & Blando, LLP, interpleader plaintiff and defendant on counterclaims, Respondent.

No. A08–1899.

Court of Appeals of Minnesota.

Sept. 29, 2009.

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for appellants R & R Investors, et al.

Robert R. Weinstine, Brooks F. Poley, Thomas H. Boyd, Justice Ericson Lindell, Winthrop & Weinstine, P.A., Minneapolis, MN, for respondent Faegre & Benson, LLP.

Kay Nord Hunt, Phillip A. Cole, Diane M. Odeen, Lommen, Abdo, Cole, King & Stageberg, P.A., Minneapolis, MN, for respondent Eckland & Blando LLP.

Timothy D. Kelly, Kelly A. Atherton, Kelly & Berens, P.A., Minneapolis, MN, for respondent R & R.

Considered and decided by KLAPHAKE, Presiding Judge; MINGE, Judge; and STAUBER, Judge.

## OPINION

MINGE, Judge.

This is an appeal from summary judgment in an interpleader action in which the district court determined that respondent partnership was entitled to the proceeds from the settlement of a lawsuit against the federal government, and dismissed appellants' damages claims against respondent law firms, who were litigation counsel in the federal lawsuit and commenced this interpleader action to resolve the dispute over settlement proceeds. We affirm.

## FACTS

Since its construction in 1978, the Maranatha Inn Apartments (the apartments) located in Royalton have been owned and operated by R & R Investors (R & R), a

Minnesota partnership. Although the same name has been continuously used, the parties dispute whether there has been one ongoing partnership or several successive partnerships. It is undisputed that there have been four separate groups of partners: Robert R. and Ruth Ann Janski; appellants Curtis Hogenson, Diane Larson, Norman Arvidson, and Gerald Berger (appellants);[1] David and Mary Klug; and respondents Paul Strangis and Kass Properties V, LLC. The Janskis are not parties to this action, and the Klugs, although named as defendants, have not appeared.

Prior to 1978, the Janskis formed R & R as a partnership and designated themselves as partners. In 1978, R & R purchased property in Royalton and built the apartments. To finance the construction, R & R obtained a $473,400 loan from and gave a mortgage to the Farmers Home Administration of the United States Department of Agriculture (USDA). The loan was made pursuant to sections 515(b) and 521(a) of the Housing Act of 1949,[2] for the purpose of increasing low-income housing in rural areas. R & R, as a section 515 borrower, was required to comply with certain conditions—including restrictions on rental rates—during the term of the loan. The loan allowed for prepayment, which would terminate any restrictions on the use of the property. In 1979, R & R obtained a second, $44,730 loan from USDA with the same conditions.

In 1984, the Janskis sold their partnership interests in R & R to appellants. A number of documents were executed in connection with this transfer, including a substitution of partnership agreement, an amended partnership agreement, an agreement to assume the USDA mortgage, quit claim and warranty deeds, and a bill of sale. Following the transaction, a partnership with the same name, R & R Investors (R & R),[3] now with appellants as partners, owned and operated the apartments subject to the conditions of the USDA loan.

In 1988, Congress passed the Emergency Low Income Housing Preservation Act (ELIHPA) of 1987. ELIHPA restricted the ability of section 515 borrowers to repay their loans. In 1997, a group of section 515 borrowers initiated an action against the United States under the Tucker Act[4] asserting that the refusal to accept prepayment of their loans constituted a breach of contract and a taking without just compensation in violation of the 5th Amendment to the U.S. Constitution (the Tucker Act claims). Although in 1997, R & R gave notice of its intent to prepay its section 515 loans and the government rejected the prepayment attempt, R & R did not join the Tucker Act litigation at that time.

In 1999, the U.S. Court of Federal Claims dismissed the Tucker Act claims,

---

1. Another partner in this group, Robert Abel, died and his partnership interests were reallocated among the remaining partners. Norman Arvidson, and Gerald Berger are also now deceased. As originally asserted, this action named Hogenson, Larson, Berger's estate and spouse Eileen Berger, and Arvidson's estate and spouse Shirley J. Arvidson. In their answering pleading, appellants named as a cross-claim and counterclaim plaintiff "R & R Investors I—UPA Partnership." In this fact section, our use of "appellants" refers to Hogenson, Larson, Berger and Arvidson.

2. Codified as 42 U.S.C. §§ 1485, 1490a (2006).

3. Unless otherwise specified, we use "R & R" to refer to the continuing partnership throughout this opinion, regardless of the changes in partners and any resulting dissolution and any reconstitution of the partnership.

4. The Tucker Act of 1887 waives the U.S. government's sovereign immunity with respect to, inter alia, claims founded on express or implied contract with the United States. *See* 28 U.S.C. §§ 1346(a), 1491 (2006).

holding that the claims accrued upon the effective date of regulations implementing ELIHPA and were not timely asserted within six years of accrual. *Franconia Assocs. v. United States,* 43 Fed.Cl. 702, 709 (Fed.Cl.1999) (citing 28 U.S.C. § 2501 (providing six-year statute of limitations for claims asserted in Court of Federal Claims)), *aff'd,* 240 F.3d 1358 (Fed.Cir. 2001), *rev'd,* 536 U.S. 129, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002).

In February 2000, appellants sold their R & R partnership interests to the Klugs. The documents related to this transfer included a purchase agreement, an amendment to amended partnership agreement, assumptions of original or withdrawing partner's obligations, and an indemnity agreement. The purchase agreement was for the sale of the apartments and personal property identified in an addendum. Another addendum to the purchase agreement provided that "[t]o facilitate the sale of this property, buying parties agree to purchase an existing partnership, known as R & R Investors." The addendum further provided that, "to facilitate the transfer," partner Gerald Berger would retain a 1% interest in the partnership for a period up to 13 months, at which time his interest would be "assigned by quit claim with no further cash remuneration."

By the amendment to the amended partnership agreement, appellants transferred their partnership interests to the Klugs. The amendment stated that it

> warrant[ed] to the transferred partners [Klugs], that this transfer shall not interfere in any way with the ordinary business of the partnership and that said sale, assignment and transfer shall not affect any of the rights, duties and obligations or the powers contained in the amended partnership agreement and that [R & R] will continue to retain, own and operate that property known as Maranatha Inn Apartments.

The accompanying indemnity agreement was premised on the understanding that appellants were "desirous of selling the partnership known as R & R Investors" and the Klugs were "desirous of buying said partnership[.]"

None of the documents related to the transfer of partnership interests to the Klugs reflects an intent by appellants to retain any interest in R & R other than the 1% interest that was to be held by Berger for a period of up to 13 months. No document refers to the Tucker Act claim, although the court of claims' dismissal was pending before the United States Court of Appeals for the Federal Circuit at the time that the documents were signed. Although the Federal Circuit affirmed dismissal of the Tucker Act claims in 2001, *Franconia Assocs. v. United States,* 240 F.3d 1358, 1366 (Fed.Cir. 2001), on June 10, 2002, the U.S. Supreme Court reversed, reviving the Tucker Act claims. *Franconia Assocs. v. United States,* 536 U.S. 129, 149, 122 S.Ct. 1993, 2005, 153 L.Ed.2d 132 (2002).

In the fall of 2002, after the U.S. Supreme Court decision, appellant Gerald Berger discussed joining the Tucker Act litigation with Jeff Eckland, who was at that time an attorney with respondent Faegre & Benson, LLP. Despite the expectation that his 1% interest would only be for 13 months, Berger had not yet transferred it to Klugs. In a letter seeking representation, Berger advised Eckland that the apartments had been sold. In February 2003, Faegre entered into a contingent-fee agreement with R & R. The agreement was signed by two of the appellants, but not the Klugs. In March 2003, Berger sent a letter to Eckland, informing him that appellants intended to obtain an agreement from the Klugs assigning to appellants the right to recover under the Tucker Act claims.

During 2003, Michael Vadnie, an attorney for appellants, contacted Eckland several times. In a May 2003 memo, Vadnie enclosed a proposed addendum to the Klug purchase agreement, the purpose of which was the "retaining of the existing partnership R & R Investors" by appellants. Faegre, through Eckland, declined to take a position regarding the entitlement of appellants to any proceeds from the Tucker Act litigation. In a July 2003 letter, Eckland advised Berger and appellant Larson: "Please be aware that any damages recovered will be awarded to the partnership of R & R Investors. It will then be the partnership's responsibility to divide and distribute the damages among the partners per your partnership agreement." In an August 2003 memo, Vadnie acknowledged a "wrinkle in our agreement that we've proffered to [the Klugs] regarding the Maranatha Inn and the R & R Investors Group." Vadnie also reported that the Klugs were reluctant to continue Berger's 1% interest in the partnership, in part because the Klugs were considering selling their own interests in the Maranatha Inn. In September 2003, without a resolution regarding appellants' entitlement to the potential damages award, Faegre initiated an action in the Tucker Act litigation naming "R & R Investors" as a plaintiff.

In January 2004, David Klug sent a letter to Larson stating: "In the event that R & R Investors, now owned by me, receives any funds through litigation started by past partner, Gerald Berger, I will assign any and all interest received to those checks and to any lawsuit proceeds to the original partners of R & R Investors." Two months later, in March 2004, respondents Paul Strangis and Kass Properties V, LLC entered into an agreement with the Klugs to purchase the Klugs'

partnership interests in R & R. In September 2004, the Klugs completed assignments of their partnership interests to Strangis and Kass. The documents included a purchase and sale agreement for partnership interests, an amended and restated partnership agreement, and assignments of partnership interests. The Tucker Act litigation is not mentioned in the documents transferring the Klugs' partnership interests.

Also in September 2004, Berger sent a letter to Faegre requesting that representation on the Tucker Act claims be transferred to Eckland's new firm, respondent Eckland & Blando, LLP. On November 3, 2004, Strangis, on behalf of R & R, signed a second contingent-fee agreement in relation to the Tucker Act litigation, retaining Eckland & Blando. In December 2005, both appellants and Strangis signed addenda to the contingent-fee agreements to re-engage Faegre as co-counsel for the Tucker Act claim.

The Tucker Act litigation settled in 2006.[5] Appellants and Strangis were presented with and signed consents to the settlement. Appellants, on behalf of their iteration of the partnership, and Strangis, on behalf of R & R as currently constituted, each claimed entitlement to the settlement proceeds.

In October 2007, the law firms initiated this interpleader action, naming appellants and respondent R & R as parties with competing interests to the settlement proceeds. Appellants answered and asserted cross-claims against respondents R & R and Strangis, and counterclaims against the law firms. Appellants and R & R and Strangis submitted cross-motions for summary judgment, and the law firms moved to dismiss appellants' claims against them.

5. The record does not indicate the exact amount of the settlement incident to the R & R claim. However, it appears to be over $450,000 net of attorney fees.

Appellants asserted that there was not a single R & R partnership but rather successive partnerships with the same name each time the partners changed and that their R & R Investors partnership had never been liquidated after dissolution.

The district court denied appellants' motion for summary judgment and granted R & R's motion, concluding that respondent R & R was a single, ongoing or reconstituted entity and, as the current owner and operator of Maranatha Inn Apartments, was the rightful owner of the Tucker Act claim, and thus entitled to its proceeds. The district court also dismissed appellants' counterclaims against the law firms. This appeal follows.

### ISSUES

I. Did the district court err by determining that the Tucker Act claim was owned by R & R Investors, as currently constituted?

II. Did the district court err by determining that appellants failed to state a claim against respondent law firms?

### ANALYSIS

"The purpose of Rule 22 interpleader is to resolve the claims of multiple claimants in one action." *Minn. Mut. Life Ins. v. Anderson,* 410 N.W.2d 80, 82 (Minn. App.1987) (citing Minn. R. Civ. P. 22). Because interpleader actions are equitable in nature, the standard of review is abuse of discretion. *Metro. Life Ins. Co. v. Belland,* 583 N.W.2d 592, 593 (Minn.App. 1998). However, the district court's rulings on issues of law are reviewed de novo. *In re Will of Kipke,* 645 N.W.2d 727, 730–31 n. 1 (Minn.App.2002), *review denied* (Minn. Aug. 20, 2002).

### I.

The first issue is whether the district court erred by treating R & R as a single, ongoing partnership that owned the Tuck-

er Act claim throughout the relevant time period. Appellants assert that, under the Uniform Partnership Act effective at the time, their withdrawal as partners in 2000 dissolved their partnership; that the Klugs created a new partnership to continue the business; that appellants did not assign their interests in the Tucker Act claim to the Klugs' new partnership; that Klugs relinquished the Tucker Act claim for the benefit of appellants; and that R & R, as currently constituted, does not own the Tucker Act claim.

The object of statutory construction is to determine and give effect to the legislature's intent. Minn.Stat. § 645.16 (2008). When the language of a statute is clear, we enforce the letter of the law. *Id.* When statutory language is not explicit, we may ascertain the intent of the legislature through considerations including the object of the law and the circumstances under which it was enacted, former laws on the same subject, and the consequences of a particular interpretation. *Id.,* subds. (2), (4)-(6). We presume that the legislature does not intend an absurd or unreasonable result. Minn.Stat. § 645.17, subd. (1) (2008). Uniform laws are interpreted "to effect their general purpose to make uniform the laws of those states which enact them." Minn.Stat. § 645.22 (2008).

We begin by noting that Minnesota partnerships have been governed by two different uniform acts during the time periods relevant to this litigation. Historically, Minnesota partnerships were governed by the Uniform Partnership Act, Minn.Stat. §§ 323.01–.49 (1996) (the former UPA). In 1997, Minnesota adopted the Uniform Partnership Act of 1994, Minn.Stat. §§ 323A.0101–.1203 (2008) (the 1994 UPA). 1997 Minn. Laws ch. 174, art. 1, § 1 to art. 10, § 70. The 1994 UPA provided staggered effective dates. Minn. Stat. § 323A.1202. Beginning January 1,

1999, the 1994 UPA governed partnerships formed after that date and other partnerships electing its application. *Id.* (a). Since January 1, 2002, the 1994 UPA has governed all partnerships. *Id.* (b). A savings clause in the 1994 UPA provides that the act "does not affect an action or proceeding commenced or right accrued before January 1, 1999." 1997 Minn. Laws. ch. 174, art. 12, § 69 at 1163.

Ordinarily in a case involving statutory amendments, our analysis begins with a determination of which version of a statute applies. *See, e.g., Mendota Golf, LLP v. City of Mendota Heights,* 708 N.W.2d 162, 166–67 (Minn.2006) (determining applicability of amended statute). Relevant factual events in this case took place both before and after the 1994 UPA became effective. Under *Franconia,* the Tucker Act claim accrued in 1997, when the government rejected R & R's effort to prepay the section 515 loan. 536 U.S. at 144, 122 S.Ct. at 2002. But other relevant events, including the retention of counsel and service of a complaint, took place after January 1, 2002, when the 1994 UPA became effective as to all Minnesota partnerships. Because the parties appear to agree that the former UPA governs and because we determine that the result is the same under either act, we do not determine which partnership act applies.

The 1994 Act resolves the issue raised in this case through language providing that (1) "[a] partnership is an entity distinct from its partners[,]" Minn.Stat. § 323A.0201; (2) partners have "no interest in partnership property," Minn.Stat. § 323A.0501; and (3) partner dissociation need not result in dissolution, Minn.Stat. § 323A.0603. The parties do not dispute that, under current law, partnership property remains partnership property despite a change in members of the partnership. Because appellant asserts that a different result was obtained under the former

UPA, we next consider the application of that act.

The former UPA defined a partnership as "an association of two or more persons to carry on as coowners of a business for profit." Minn.Stat. § 323.02, subd. 8 (1996). This definition was consistent with the common law, under which partnerships were viewed strictly under an aggregate theory, the basic premise of which is that a partnership has no legal existence separate from its partners. *Twin City Brief Printing Co. v. Review Pub. Co.,* 139 Minn. 358, 364, 166 N.W. 413, 415 (1918). The former UPA also followed the aggregate view with respect to dissolution, which occurred upon any "change in the relation of the partners caused by any partner ceasing to be associated in the carrying on ... of the business." Minn.Stat. § 323.28 (1996). Put another way, "the withdrawal of a member from a partnership operate[d] to dissolve the partnership." *Egner v. States Realty Co.,* 223 Minn. 305, 311, 26 N.W.2d 464, 468 (1947).

■ "Dissolution of a partnership trigger[ed] an end to the relationship, but it [did] not end the partnership itself." *Hurwitz v. Padden,* 581 N.W.2d 359, 361 (Minn.App.1998), *review denied* (Minn. Aug. 31, 1998). Rather, the partnership continued through a winding-up phase, during which partnership assets were liquidated and the proceeds distributed to the partners. Minn.Stat. §§ 323.29, 323.37 (1996); *see also Hurwitz,* 581 N.W.2d at 361 (explaining that the "partnership relationship continue[d] to exist until all issues involving the business of the partnership entity [were] resolved"). This winding-up process could encompass pursuit of and recovery on an outstanding legal claim. *See, e.g., Lamborn & Co. v. United States,* 106 Ct.Cl. 703, 65 F.Supp. 569, 571 (1946) (holding that surviving partners were proper parties to bring a cause of action

accruing to the partnership during its existence).

As an alternative to winding up a partnership under the former UPA, all of the partners could agree that the business of the partnership would be continued by some of the partners and/or third parties. *See Maras v. Stilinovich*, 268 N.W.2d 541, 544 (Minn.1978) (holding that "[a]greements for continuation of partnership business after dissolution are generally valid and enforceable."); *see also* Minn.Stat. § 323.40 (1996) (addressing liability to third parties of a partnership continuing the business purpose of a dissolved partnership). Appellants concede that the transfer of their partnership interests in 2000 included an agreement that the business purpose of the partnership be continued by the Klugs. But they argue that the Klugs continued the business under a new, separate partnership, that the Tucker Act claim was a distinct asset that was not transferred, and thus that the Tucker Act claim did not become the property of the Klugs' partnership.

Although not addressed in the text of the former UPA, the continuation of the business of a dissolved partnership by some of the partners and/or third parties apparently was understood to create a new partnership. *See* Uniform Partnership Act 1914, § 41, comment to subd. 1 (1914) ("It is universally admitted that any change in membership dissolves a partnership, and creates a new partnership."). *But see* Alan R. Bromberg, *Partnership Dissolution—Causes, Consequences, and Cures*, 43 Tex. L.Rev. 631, 647 n. 98 (1965) (identifying competing views among commentators on this issue). This understanding is consistent with the former UPA's definition of a partnership and its treatment of dissolution. Thus, we agree with appellants that the Klugs technically created a new partnership. We do not agree, however, that, through this techni-

cality, appellants retained ownership of the Tucker Act claim.

Appellants assert that the former UPA's adherence to the aggregate theory of partnership compels a conclusion that the Klugs' partnership could not have obtained the right to the Tucker Act claim unless it was clearly assigned. Contrary to appellants' assertion, however, there was a dispute even at the time of its passage regarding whether the UPA was properly viewed as espousing an aggregate or entity theory. *See generally* Donald J. Weidner, *Three Policy Decisions Animate Revision of Uniform Partnership Act*, 46 Bus. Law. 427, 428–29 (Feb.1991) (summarizing differences between drafters and asserting that "the extent to which the final product incorporates the aggregate as opposed to the entity theory is very much in the eye of the beholder"). In 1935, the Minnesota Supreme Court explained that "[a]lthough the [former UPA] does not make a partnership an entity for all purposes, it does so treat it in certain respects and for certain purposes." *Keegan v. Keegan*, 194 Minn. 261, 263, 260 N.W. 318, 319 (1935). And by 1941, the court observed that the "modern tendency" was "to treat a partnership as an entity distinct from and independent of the individuals composing it." *Gleason v. Sing*, 210 Minn. 253, 257, 297 N.W. 720, 722 (1941) (noting that former UPA "has wrought decided changes in the common-law conception of [partnerships]").

One of the areas in which the former UPA treated partnerships as entities was with respect to partnership property. The former UPA parted ways with the common law by providing that partnerships could hold property, including title to real estate, and limiting the individual partners' rights to dispose of partnership property. Minn. Stat. §§ 323.07, 323.24 (1996). At common law, partnership property was held in joint

tenancy by the partners and thus could at least theoretically be disposed of by any individual partner and reached by any individual partner's creditors. The former UPA created the tenancy in partnership, which deprived partners "of all power of separate disposition, even by will." *Windom Nat'l Bank v. Klein*, 191 Minn. 447, 451, 254 N.W. 602, 604 (1934).

■ While the former UPA did not expressly address the fate of partnership property in a post-dissolution continuation of the business, we conclude that, absent agreement to the contrary, the partnership property of a dissolved partnership became the property of the partnership continuing the business without need for separate devise. We base our conclusion primarily on the former UPA's treatment of partnership property and allowance for continuation of partnership businesses. Appellants' reading of the former UPA would frustrate the purposes of these provisions. *See* Minn.Stat. § 645.17, subd. (1) (stating presumption that legislature does not intend an absurd or unreasonable result). We further note that our reading of the former UPA finds support in commentary to the uniform act upon which the former UPA was based. Uniform Partnership Act 1914 § 41, comment to subd. 1 (1914) (explaining that former UPA does not "alter the rule that on any change of personnel the property of the dissolved partnership becomes the property of the partnership continuing the business").[6]

Appellants assert that this interpretation of the former UPA is incorrect because the 1994 Act expressly provides for partnership property to remain with the partnership, suggesting that this was not the law under the former UPA. We disagree and conclude that the 1994 UPA's express treatment of partnership property and the continuation of business clarified and codified what had been the emerging, entity-based trend under the former UPA. *Cf. Creel v. Lilly*, 354 Md. 77, 729 A.2d 385, 392–93 (1999) (noting that many jurisdictions found sections of UPA harsh and rigid and that the revised uniform act was drafted as a modern alternative and to "reflect the emerging trends in partnership law").

■ Appellants also assert that there was an agreement for them to retain ownership of the Tucker Act claim and that the former UPA does not preclude such an agreement. *See Stacker & Ravich v. Simon*, 411 N.W.2d 217, 225 (Minn.App.1987) (observing that former UPA governs if there is no contrary agreement), *review denied* (Minn. Nov. 13, 1987). The sole support for this position is an affidavit submitted to the district court by David Klug, in which he states that the parties did not intend for the Tucker Act claim to be transferred from appellants to the Klugs.

Klugs' affidavit testimony is inconsistent with the contemporaneous conduct of both appellants and the Klugs. That conduct was appellants' attempts to amend the purchase agreement to retain the Tucker Act claim and David Klug's future prom-

---

6. Of the former UPA's failure to expressly address the circumstances before us, one commentator noted:

> [I]t is clear that both at common law and under the UPA, any change in partner composition, followed by a continuation of the business without liquidation, has two related effects. The first result is to terminate the old partnership and to create in its stead a new partnership. The second effect is to convert property formerly owned by the partners as a part of the old partnership into property owned by the continuing partners as part of the new partnership.
>
> What is not clear is the mechanism by which this change in ownership takes place.

Gary S. Rosin, *The Entity–Aggregate Dispute: Conceptualism & Functionalism in Partnership Law*, 42 Ark. L.Rev. 395, 438 (1989).

ise, which was never performed, to assign the proceeds to appellants.[7] Thus, the Klug affidavit does not create a genuine issue of material fact precluding summary judgment. *Cf. Risdall v. Brown–Wilbert, Inc.*, 759 N.W.2d 67, 72 (Minn.App.2009) ("A self-serving affidavit that contradicts other testimony is not sufficient to create a genuine issue of material fact."), *review denied* (Minn. Mar. 17, 2009).

■ Appellants assert that R & R, as currently constituted, cannot be entitled to the Tucker Act proceeds because of a federal anti-assignment statute and the language of the settlement agreement itself, which precludes distribution of settlement proceeds to a party that assumed a section 515 loan after it became subject to prepayment restrictions. We agree with the district court that the continuing and reconstituted R & R partnership held the section 515 loan throughout the relevant time period and reject appellants' arguments in these regards.

Because we conclude that the Tucker Act claim remained the property of the Klugs' partnership upon their continuation of the business, the district court did not err in concluding that R & R Investors, as currently constituted with Strangis and Kass Properties V as partners, is entitled to the proceeds from the settlement of the Tucker Act litigation.

## II.

■ The second issue in this appeal is whether the district court erred by dismissing, under Minn. R. Civ. P. 12.02(e), appellants' counterclaims against respondent law firms. On appeal from dismissal

for failure to state a claim under rule 12.02(e), "the only question before [this court] is whether the complaint sets forth a legally sufficient claim for relief." *Barton v. Moore*, 558 N.W.2d 746, 749 (Minn. 1997). Some of the district court's analysis of the counterclaims suggests consideration of matters outside the pleadings and conversion of the rule 12 motion to a summary judgment motion. Thus, we apply a summary judgment standard of review. *See* Minn. R. Civ. P. 12.02 (providing that a motion on the pleadings shall be treated as a summary judgment motion when materials outside the pleadings are considered); *Carlson v. Lilyerd*, 449 N.W.2d 185, 187 (Minn.App.1989) (explaining that when the "case involves a motion for judgment on the pleadings where more than just the pleadings were considered, we review the trial court's determinations under a summary judgment standard"), *review denied* (Minn. Mar. 8, 1990).

■ The district court grouped the appellants' counterclaims against the law firms into three categories: fraud-based claims, malpractice-based claims, and a conversion claim. The fraud-based claims are premised on a number of alleged misrepresentations by respondent law firms as to the identity of their client for the Tucker Act claims. The district court determined that appellants did not effectively allege that the law firms made such misrepresentations. The district court further concluded that appellants had not alleged any detrimental reliance on the alleged misrepresentations. We agree with this district court conclusion. *See, e.g., Specialized Tours, Inc. v. Hagen*,

7. Klug's representation, as an individual, that he would assign proceeds of the claim was not effective to bind the R & R partnership under the 1994 UPA, which governed all partnerships by the time Klug made this promise in 2004. *See* Minn.Stat. §§ 323A.0203 (providing that partnership property is property of

partnership, not the individual partners); 323A.0302 (providing that partnership property is transferred by instrument "executed by a partner in the partnership name"); 323A.0501 (providing that partner has no transferable interest in partnership property).

392 N.W.2d 520, 531 (Minn.1986) (stating elements of fraud claim to include false representation of material fact and detrimental reliance). Thus, we conclude the district court did not err in ruling that the fraud counts do not state a cause of action.

■ The malpractice-based claims are premised on the law firm's alleged breach of various ethical rules. Notably, the attorney-client relationship with the respondent law firms was limited to the litigation of the Tucker Act claims, which resulted in a settlement. The district court concluded that appellants could not prove damages arising from the basic litigation representation because they do not challenge the adequacy of the settlement obtained. With respect to distribution of settlement proceeds, we note that because the funds have been placed in escrow, no money has been lost. Because we have affirmed the district court's determination that appellants are not entitled to those proceeds, we agree with the district court's legal conclusion that appellants did not suffer damage and that their malpractice-based claims fail as a matter of law. *See, e.g., Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.,* 711 N.W.2d 811, 816 (Minn.2006) (identifying four elements of legal-malpractice claim: "(1) the existence of an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts were the proximate cause of the plaintiff's damages; and (4) that but for defendant's conduct, the plaintiff would have been successful in the prosecution or defense of the action" (quotation omitted)).

■ We finally agree with the district court's conclusion that given the law firm's initiation of an interpleader action to determine the rightful owner of the funds, appellants did not state a claim for conversion of the settlement proceeds. *See Fawcett v. Heimbach,* 591 N.W.2d 516, 519–20 (Minn.App.1999) (defining conversion as "an act of willful interference with the personal property of another that is *without justification* or that is inconsistent with the rights of the person entitled to the use, possession, or ownership of the property" (emphasis added)); *cf. Hildegarde, Inc. v. Wright,* 244 Minn. 410, 413, 70 N.W.2d 257, 260 (1955) (holding that bailee could, without being liable for conversion, require proof of right to title or possession before delivering goods demanded).

### III.

Appellants have moved this court to take judicial notice of a December 2, 2003 quit-claim deed by appellant Curtis Hogenson and his wife that was inadvertently omitted from the district court file. This document does not alter any of the foregoing analysis. There is already a March 21, 2003 quit-claim deed signed by Hogenson in the record; and appellants do not explain why they seek judicial notice of the December 2, 2003 quit-claim deed. Nevertheless, we grant the motion. *See* Minn. R. Evid. 201(b), (d) (requiring, upon motion and proper showing, judicial notice of facts "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

### DECISION

Because the district court did not err by (1) concluding that respondent R & R Investors is entitled to the proceeds of the settlement in the Tucker Act litigation; and (2) dismissing appellants' counterclaims against respondent law firms, we affirm.

**Affirmed; motion granted.**