## Case No. 18,267.

### CHARGE TO GRAND JURY—NEUTRALITY LAWS.

[5 McLean, 306.]

Circuit Court, D. Ohio.    Oct., 1851.

VIOLATION OF NEUTRALITY LAWS — SETTING (N FOOT MILITARY EXPEDITION—INTERNATIONAL LAW.

[1. The acts enumerated in section 6 of the neutrality law of April 20, 1818 (3 Stat. 449), are all in the disjunctive. The offense is consummated by any overt act which shall be a commencement of an expedition, though it should not be prosecuted. Any combination of individuals to carry on an expedition is "setting it on foot," within the meaning of the statute, and the contribution of money or anything else which shall induce such combination may be a beginning of the enterprise.]

[2. A person may be convicted of "providing the means" for such an enterprise, if he furnish munitions of war, provisions, transportation, clothing, or any other necessaries to men engaged in the expedition.]

[3. Citizens of the United States, who organize an expedition and invade a province or colony which is part of the dominions of a power with which the United States are at peace, thereby place themselves beyond the pale of civilization, and become pirates and outlaws.]

[4. If citizens of one nation commit depredations against another, and are not punished by their own government or given up to the injured government for punishment, the nation to whom they owe allegiance becomes a party to their wrong, under the principles of international law.]

After presenting to the grand jury certain violations of the laws of congress, which ordinarily come under the consideration of the grand jury, McLEAN, Circuit Justice, remarked:

A sense of duty requires me to call your special and serious attention to an act of congress of the 20th of April, 1818, which is entitled "An act for the punishment of certain crimes." The first section of that act provides "that if any citizen of the United States shall, within the territory and jurisdiction thereof, accept and exercise a commission to serve a foreign prince, state, colony, district, or people, in war, by land or by sea, against any prince, state, colony, district, or people, with whom the United States are at peace, the person so offending shall be deemed guilty of a high misdemeanor, and on conviction shall be fined not more than two thousand dollars, and imprisoned not exceeding three years." The second section declares "that if any person shall, within the territory or jurisdiction of the United States, enlist or enter himself, or hire, or retain another person to enlist or enter himself, or go beyond the limits or jurisdiction of the United States, with intent to be enlisted or entered in the service of any foreign prince, state, colony, district, or people, as a soldier, &c., shall be deemed guilty of a high misdemeanor, and shall be fined not exceeding one thousand dollars, and imprisoned not exceeding three years." Sec. 6. "That if any person shall, within the territory or jurisdiction of the United States, begin or set on foot, or provide or prepare the means for, any military expedition or enterprise, to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace, every person so offending shall be deemed guilty of a high misdemeanor, and shall be fined not exceeding three thousand dollars, and imprisoned not more than three years." To this section your attention is specially solicited. You will observe that the enumerated acts which constitute the offense are all in the disjunctive. To "begin" the military expedition spoken of, is an offense within the statute. To begin it, is, to do the first act, which may lead to the enterprise. The offense is consummated by any overt act which shall be a commencement of the expedition, though it should not be prosecuted. Or if an individual shall "set the expedition on foot," which is scarcely distinguishable from beginning it. To set it on foot may imply some progress beyond that of beginning it. Any combination of individuals to carry on the expedition is "setting it on foot," and the contribution of money or anything else which shall induce such combination, may be a beginning of the enterprise. "To provide the means for such an enterprise," is within the statute. To constitute this offense, the individual need not engage personally in the expedition. If he furnish the munitions of war, provisions, transportation, clothing, or any other necessaries, to men engaged in the expedition, he is guilty, for he provides the means to carry on the expedition. It must be against a nation or people with whom we are at peace. In passing

the above law, congress has performed a high national duty. A nation, by the laws of nations, is considered a moral being, and the principle which imposes moral restraints on the conduct of an individual, applies with greater force to the actions of a nation. "Justice," says Vattel, "is the basis of society, the sure bond of all commerce. Human society, far from being an intercourse of assistance and good offices, would be no longer anything but a vast scene of robbery, if there were no respect to this virtue, which secures to every one his own." "It is still more necessary between nations than between individuals, because injustice produces more dreadful consequences in the quarrels of these powerful bodies politic, and it is still more difficult to obtain redress."

These remarks are made, and the law cited, in reference to the late military expedition against the island of Cuba. That expedition was organized in this country, and was composed, principally, of our own citizens. Its object was to subvert the government of Cuba—a part of the Spanish dominions. With the government of Spain we have a treaty of peace and amity. A foreigner was at the head of the expedition. He seems to have been a credulous and weak man. He was impetuous, but was wanting in sagacity and judgment. His melancholy fate may excite our sympathy, but his memory is loaded with the execrations of thousands. He was instrumental in corrupting the minds, and withdrawing from their allegiance, many of our youth, who have paid the penalty of their temerity and recklessness. Their conduct admits of no other mitigation than that they were misled by falsehoods. They were induced to believe that a considerable portion of the people of Cuba were in arms, with the determination to overthrow their government. Those who were instrumental in creating this delusion have an awful account to render to their country and their God. The invading force, instead of meeting friends, met determined enemies with arms in their hands. At every step the invaders were opposed, and it is not known that a single Cuban joined the enemy. As might have been anticipated, the career of the invaders was short and extremely disastrous. Their sufferings were almost without a parallel; and, with two or three exceptions, those of them who were not taken prisoners and executed, were sentenced to an ignominious imprisonment in Spain. This second expedition terminated more disastrously than the first one. That was fitted out by the same leader, and the force was also raised and organized in our country, in defiance of its laws. The leaders and men were alike guilty in each, but as in the first expedition but few were killed, it created less sensation in the country than the late one. These unlawful enterprises cast a shade upon our national character, in the opinion of the civilized world. They unjustly, more or less, connect our government with the outrage, and they ascribe it to a lust for power and national aggrandizement. The chief executive, by proclamation, from time to time, warned the country of the unlawfulness of the enterprise, and of the punishment to which those engaged in it would be exposed. The executive and ministerial officers of the government were exhorted to be on the alert, to check and defeat the nefarious design. And a part of the navy was charged with the same service. But these efforts were ineffectual; in their madness and folly those who were embodied, trampled upon the laws of their country, and rushed upon their own destruction. To suppose that they could, under such circumstances, have been impelled by any justifiable motive in their own views, is to suppose them to have been laboring under a most extraordinary mental aberration. The duty of giving effect to law devolves upon the judiciary,

and you, gentlemen, for the time being, constitute an important part of that branch of the government. And now that the excitement growing out of the late expedition has subsided, and its fatal results are fully known, it becomes us, from the position we occupy, to take a calm, a considerate, and legal view of the circumstances which led to it, and of the acts of our own citizens. In this respect, your inquiries will be limited to the district of Ohio.

Our own history may show in what light our government has considered those opposed to us, who placed themselves beyond the limits of civilized warfare. Gen. Jackson, while engaged in the subjugation of savages in the South, captured two white persons who were banded with them, and in a great measure controlled their depredations. Arbuthnot and Ambrister were British subjects, who having been taken in arms, fighting on the side of the Indians against our armies, and within our territory, were summarily tried and summarily executed, and the commanding general was sustained by his government. Great Britain was too well acquainted with the laws of nations, and with the justice of the punishment, to make it a subject of serious remonstrance. Compare the acts of these unfortunate men with the invaders of Cuba. Arbuthnot and Ambrister united themselves with the weaker party, and took part in the war. They were associated with savages, but savages who, to some extent, were allowed to possess the attributes of a nation. Treaties were made with them, and they had always exercised the right of carrying on war against the whites. These men identified themselves with this people in the war, and in doing so, did not, it is believed, violate any express law of their own country. They incurred the hazards of such a war, were taken, and justly condemned. Our citizens, in the invasion of Cuba, put at equal defiance the laws of their own country, and the laws of nations. They were covered by no flag; protected by no public opinion, governed by no general law. They placed themselves beyond the pale of civilization, and in doing so, became pirates and outlaws. They invaded a nation who were protected from outrage and injustice by the solemn guaranty of a treaty—a treaty in which our national honor was deeply concerned. No nation could be bound by a more solemn or higher obligation than our government is bound to maintain the most friendly relations with Spain. And the expedition was directed against an unoffending people. A people who were content with their government, and not desirous of a change. Neither in the landing of the invading army, nor in its progress through the country, was there found a traitor to the Cuban government. This is a most extraordinary fact. It could scarcely be realized by the invasion of any other country under similar circumstances. The liberating army found no one willing to be liberated. They were everywhere received as enemies. It is not known that any cruelties were perpetrated by the invaders on individuals. It is believed there were none. But their way was marked with blood—blood shed in skirmishes and in more general engagements. There never was an invasion among civilized nations, more atrocious and less excusable.

Let us suppose a similar invasion of our own country. And here it may be premised that if complaints against our government and a determination to overthrow it, in a certain quarter, afford any excuse for the combination of a foreign force against us, a strong case could be made out. But suppose an armed force, acknowledging allegiance to no government or people, should invade any part of our country with an avowed intention of overturning the government, how speedily would it meet destruction. Such an indignity and outrage would cause the blood to thrill through the veins of every American. Gentlemen, our government must be just to ourselves, and just to other nations. A government is responsible for the acts of its citizens. Not, it is true, in the first instance, where they commit depredations upon a friendly nation. But if such citizens are not punished or given up to the injured government for punishment. the nation to whom they owe allegiance becomes a party to the wrong. This is an acknowledged principle in the law of nations. But the duty we owe to ourselves is of the highest obligation. No free government can be sustained, which does not enforce its laws. A deep and abiding respect for the laws, has heretofore been the glory of our country. In that consists our strength. Those who are unacquainted with the principles of our government, seem naturally to conclude it is wanting in energy and power. But they do not comprehend the secret of its strength. The majesty of the law pervades every part of the nation, and operates unseen; but its effects are visible. It has, heretofore, required no military display of men at arms to carry it into effect. But I am concerned to say that our late history, in this respect, will not compare with the past. There is, I fear, a growing indifference to the laws. When Aaron Burr was suspected of being engaged in an enterprise against the adjacent provinces of Spain, connected, as was apprehended, with a dissolution of the Union, the country was greatly excited. and he was pursued, arrested, and indicted for treason. Does the same deep feeling for the Union and its laws now pervade our country?

If it shall appear from the evidence that shall be given, that any of our citizens have violated the above law, it will be your duty to indict them. Laws that remain upon our statute book should be operative, or they should be repealed. The national standard is lowered. and licentiousness is increased. by a failure to enforce the penalties of the law. Our institutions can be sustained only on a moral basis. This is wanting in France, and they cannot maintain a free government. They may have the form, but the substance will be wanting. At this moment the republic of France, as it is called, is restrained and governed by physical power. And if our government, in our external and internal affairs, shall be so managed as to destroy its moral basis, we may as well attempt to build a structure in the air, as to sustain it. I fear this great fact may not be properly appreciated. On it depends, not only the prosperity of our free institutions, but their existence.