Jim GREGRIS, Elaine Nesser, Randolph Zacour and American Federation of State, County and Municipal Employees, District Council 84, AFL–CIO, Plaintiffs,

v.

Sanford EDBERG, individually and as Coroner of Allegheny County, Pennsylvania; Michael Cassidy, individually and as Chief Deputy Coroner of Allegheny County; Tom Foerster, individually and as Chairman of the Allegheny Commission; Dr. William Hunt, individually and as a member of the Allegheny County Commission and Cyril H. Wecht, individually and as a member of the Allegheny County Commission, Defendants.

Civ. A. No. 81–497.
Misc. No. 12826.

United States District Court,
W.D. Pennsylvania.

Sept. 18, 1986.

Alaine S. Williams, Philadelphia, Pa., for plaintiffs.

Vincent C. Murovich, Ira Weiss, Deputy County Sol., Arnold Friedman, Pittsburgh, Pa., for defendants.

## OPINION

ROSENBERG, District Judge.

This matter presently before me is an outgrowth of a final judgment entered in this Court on August 23, 1985 and affirmed by the Court of Appeals for the Third Circuit, *Gregis et al. v. Sanford Edberg et al.*, 787 F.2d 581, 582 (1986).

A new previously mutually dismissed party, the County of Allegheny, has interjected itself again on an issue which threatens to obstruct the jurisdictional functioning of the court. Three employees of the Coroner's office were dismissed politically and without cause. They brought suit in this court and recovered a judgment against the incumbent, dismissing Coroner, Sanford Edberg, and against the Coroner's office for the sum of $29,196.94, and as heretofore stated, affirmed. The plaintiffs' counsel then issued an attachment execution against the personal assets of the Coroner's office, and the County of Allegheny brought itself in as a party and claimed ownership of all the assets of the Coroner's office.

The present proceeding took an untoward turn after the matter was called for two arguments on the basis of first, whether or not the personal property in the Coroner's possession was subject to attachment and execution; and second, for attorneys' fees.

Counsel for the plaintiffs was permitted to open the arguments into a hearing and a court reporter was called for this occasion. Counsel presented evidence through his county employee witnesses that the claims for salaries of the plaintiffs were presented by warrant to the County Commissioners for payment and that these particular salaries had not been included in the budget for the regular salaries of the Coroner's office;

that the matter was presented to the proper authorities, and especially to the County Commissioners, for authorization of payment of the warrant by the Commissioners and the County Treasurer; and that it was rejected without any recorded reason, and no reason was introduced into evidence by the County. Therefore, it is undoubted that there was an appropriate process by the Controller's office to have the County pay the salaries in the usual course of business and for the money to come out of the County Treasury, but that the Commissioners neglected to honor that warrant; and I so find.

Since no reason was shown, one may conclude that because this was a political matter originally, the political aspect may have continued, but to draw this conclusion would not be fair without evidence to that effect. The more logical conclusion is that since the County Commissioners are advised by the County Solicitor and his staff, the matter had been referred to the Solicitor and the Commissioners were not advised to make payment of the claims. Since such action amounts also as well to the rejection and dishonoring of the judgment of the Federal Court, and since no reasons have been given or appear on why such a judgment was dishonored, this court finds it judicially appropriate to enforce its judgment by due process of law.

What is due process of law here? The evidence in this case shows that all the revenue and income of the Coroner's office was and is turned over to the County Treasurer, and that warrants were and are issued for payment of all expenses of the office to the County Treasurer by the County Commissioners and processed for payment of these amounts. Since the income of the Coroner's office enriched the County Treasurer, and it is through the County Treasury that all expenses are taken out of presumably this fund contributed and submitted by the Coroner's office, it would seem unreasonable that the County should be legally entitled to retain all of the funds and not pay legitimate, legal and judicial obligations imposed upon the office in the same way it would for all other debts

of the Coroner's office, which includes salaries. Thus, the claims for which judgment was entered here are such obligations and became the obligations of the County Commissioners, who controlled the payment of debts by warrant to the County Treasurer.

The deputy county solicitor who represented the County Commissioners has himself suggested that the plaintiffs' appropriate remedy was by mandamus; and there is sufficient evidence in this case which would warrant the issuance of a writ of mandamus. Counsel for the plaintiffs was asked why he did not request such a writ of mandamus to the court, and his explanation was flimsy. He said primarily it would take six years for termination of such a proceeding. The fact that counsel's judgment was such, is not necessarily factual, since it is incumbent upon this court now no matter what counsel may have had in mind, to act expeditiously to bring justice to fruition as soon as possible.

Here are three former employees of the Coroner's office who are entitled to their salaries and all three of whom have not been paid since 1981. It is strengthened and supported by a judgment of this court, and payment of this judgment should be honored.

This action has been delayed so overlong that it is not to the credit of this court nor for the benefit of the parties that it be delayed any longer. That delay must be stopped and without further incurrence of potential enormous expenses for attorneys' fees to the public. Thus, it is incumbent that the salaries of the former employees be paid as soon as possible and the attorneys' fee claims be stopped.

Odd as it may seem, it would be unthinkable to attach public property such as that which the Coroner uses every day in the week for vital purposes and deprive the public, as well as the Coroner, of its use. This I cannot sanction. Therefore, I deem it incumbent upon me to provide a remedy that will produce justice for the plaintiffs and not permit an obligor to flaunt the judgment of this court. Federal courts are

deemed to be courts of justice and equity. This is a case in which justice can be done even though not in accord with the prayer of the plaintiffs or the present defendant, County of Allegheny.

■■■ As I stated before, counsel for the County mentioned that it would have been appropriate for the plaintiffs to have procured a Writ of Mandamus against the County Commissioners to compel payment. Although he was logically correct, he was not legally correct in this court as a follow-up for enforcement of its judgment. Ordinarily, where the court has the power, mandamus does lie to compel officers with discretionary powers to take action. *Drew v. Lawrimore*, 380 F.2d 479 (C.A. 4, 1967), cert. den. 389 U.S. 974, 88 S.Ct. 475, 19 L.Ed.2d 467 (1967). Only where the duty to be performed is ministerial and the obligation to act peremptory and plainly defined will mandamus issue. *Ralph Jackson v. Cecil McCall*, 509 F.Supp. 504 (D.C. D.C., 1981). No new rights can be acquired in a mandamus action, the purpose of which is to enforce rights already vested. *Klupt v. Blue Island Fire Dept.*, 489 F.Supp. 195 (D.C.Ill., 1980). Mandamus generally does not lie where there is another remedy available. *Spacil v. Crowe*, 489 F.2d 614 (C.A. 5, 1974.)

However, we are required to follow the Federal Rules of Civil Procedure. Rule 81(b) states:

"(b) Scire Facias and Mandamus. The writs of scire facies and mandamus are abolished. Relief heretofore available by mandamus or scire facias may be obtained by appropriate action or by appropriate motion under the practice prescribed in these rules."

■■■ Thus it is that a writ of mandamus does not exist in the district court jurisdiction. *Finley v. Chandler*, 377 F.2d 548 (C.A.9), cert. den. 389 U.S. 869, 88 S.Ct. 146, 19 L.Ed.2d 147 (1967). Even though the writ of mandamus has been abolished, the court can give the same relief that would be called for by mandamus by using other methods provided by law. *Willis v. White*, 310 F.Supp. 205 (D.C.La., 1970). A motion to enforce judgment is a proper procedure to be utilized to compel compliance with the court's decision where the court's decree had been willfully and deliberately violated. *Mississippi Valley Barge Line Co., et al. v. United States*, 273 F.Supp. 1 (D.C.Mo.1967), aff'd. 389 U.S. 579, 88 S.Ct. 692, 19 L.Ed.2d 779 (1968).

The abolition of a writ of mandamus does not proscribe a district court from the efficacious undertaking by Congress when it enacted the following:

"§ 1651. Writs

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." All Writs Statute, 28 U.S.C. § 1651, as amended May 24, 1949, c. 139, § 90, 63 Stat. 102.

In the careful reading of Rule 81(b), it will be seen that "relief ... may be obtained by appropriate action or by appropriate motion under the practice prescribed in these rules", and § 1651 says that the Supreme Court and federal courts established by the Act of Congress " ... may issue all writs necessary or appropriate in aid of their respective jurisdictions ..."

■■■ While Rule 81(b) did indicate that relief was to be initiated by one seeking the aid of the court, § 1651 vests all initiative in "The Supreme Court and all courts established by the Act of. Congress" in a discretionary way by the use of the words "may issue all writs necessary or appropriate ..." Thus, while the Rule may indicate that it requires a litigant to trigger necessary action for relief of a litigant, the statute gives "The Supreme Court and all courts established by Act of Congress" power to originate remedies without petition or motion. This can be read into the words in § 1651 in providing for the capability of voluntariness on the part of the court to issue "all writs necessary or appropriate in aid of their respective jurisdictions". The section, itself, then is a device created by Congress to enable courts to

prevent from being left on the precipice or a path leading nowhere. It would seem by this section Congress frowns upon the idea that a court should be left stranded in mid air, which would be the case here if I left the three plaintiffs dangling without any visible, possible remedy to them. Since federal courts, being courts of equity, must be conscientious in their functioning, it would be unconscionable to permit such an unjust situation to exist. See *Spain v. Mountanos*, 690 F.2d 742, (C.A. 9, 1982). Under this section, this court has authority to issue extraordinary writs for the sole purpose of protecting its respective jurisdictions of a federal court. *Harris v. Dept. of Corrections*, 426 F.Supp. 350 (D.C.Okla., 1977). The courts of the United States have inherent statutory power and authority to enter such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being thwarted and interferred with by force, guile, or otherwise, whether or not the person charged with the violation of the judgment or decree was originally a party defendant to the action. *Mississippi Valley Barge Line Co. v. United States*, *supra*. This action is a congressional reaffirmation of power of every court to enforce its judgments and decrees. *Dixie Highway Exp., Inc. v. United States*, 268 F.Supp. 239 (D.C.Miss.), rev. on other grounds, 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967).

█ It will be seen that Congress provided this remedy in aid of jurisdiction. Thus, this court having original jurisdiction to act in this matter, but as it relates to the incoming party, the County of Allegheny, it has jurisdiction under the All Writs Act because the County of Allegheny made itself a party and vested the court with supplemental jurisdiction. Power conferred by this action extends, under appropriate circumstances, to persons who though not parties to the original action, are in a position to frustrate the authority and jurisdiction of the court, and it encompasses even those who have not taken any affirmative action to hinder justice. *United States v. New York Tel. Co.*, 434 U.S.

159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). This court had original jurisdiction as was required when the plaintiffs filed the complaint here originally, and once jurisdiction was properly vested in this court, this section enjoins this court now to enter such orders as it deems necessary in its discretion to preserve and protect its jurisdiction. *Application of United States in Matter of Order Authorizing Use of a Pen Register*, 538 F.2d 956 (C.A. 2, 1976), rev. on other grounds 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). Accordingly, the court certainly does have the authority and the duty to protect and effectuate its judgment. *United States v. State of Washington*, 459 F.Supp. 1020 (D.C.Wash., 1978), aff'd. 645 F.2d 749 (9th Cir.1981).

█ Since the use of an extraordinary remedy in the nature of mandamus, or even injunction, may be considered to be harsh, when only an action exists for the enforcement of a district court judgment, and the recovery of funds, if it is obvious that no other remedy is available for the enforcement of the court's judgment and where there is a flagrant attempt to thwart the affirmed judgment of a district court, then the All Writs Act becomes the necessary tool by which the district court may fashion the completion of equitable justice.

Since the County of Allegheny voluntarily brought itself into this action for its claimed remedies, in so doing it also brought itself into this court's jurisdiction and not only vested the court with a right to grant it benefits, but also to impose liabilities where properly adjudicated against it. In accordance with the findings contained in this opinion, this court will, by an order of court, require that the County of Allegheny assume its lawful liabilities to pay the judgment and a part of the attorneys' fees as hereinafter set forth.

## ATTORNEYS' FEES

Plaintiffs' counsel presented a bill for attorneys' fees with full details of time and energy expended for a total of $40,315.00. The anomaly of this situation is that the

claim itself amounts to only $29,196.94 with interest.

The demand for the claim is further complicated by the fact that this matter took four years for a final determination to judgment. It is now taking an additional period of time to make determination of a follow-up issue after the judgment was rendered with a new party having injected itself into the entire litigation, and further prolonging the finality of the enforcement of the judgment and still further aggravating the amount of work which the plaintiffs' counsel are required to perform. Delay, legal maneuvering and imprudent and inappropriate, and therefore, unnecessary action occurred which required the spending of more time and presumed service. Except for approximately one year's time when the matter had been referred to another judge of this court, after which it had been returned to me, I am fairly familiar with all of the maneuvering which has occurred in this case. Accordingly, it is incumbent upon me to examine the documents presented by plaintiffs' counsel for the compensation of attorneys' fees.

In order to arrive at a just determination of what the plaintiffs are entitled to receive as attorneys' fees, it is necessary that we separate the claims as made.

The plaintiffs were the only ones who presented evidence on the value of the attorneys' fees. No one objected to it. Unfortunately, others who might have objected to it are those who serve the public, since in the ultimate it is the public who will be called upon to bear much of the burden of compensating the plaintiffs' counsel, who were forced to contest the unreasonable positions taken by the Coroner's office and subsequently the County of Allegheny.

Therefore, it becomes the duty of the presiding judge to examine every fact of the claims so that justice may be done. I have carefully examined and re-examined every facet of the case and these claims and come to the following conclusion. But first of all, I cannot refrain from remarking that the plaintiffs and their counsel in

this case who have waited for their money from the day when the plaintiff-employees were fired have not yet been paid, and I shall not intentionally prolong the delay further, if I can possibly avoid it.

This matter was initially before me on March 30, 1981, when a complaint and motion for a preliminary injunction was filed. At the initial hearings on April 7th and 8th, evidence was presented that three Coroner's office employees were dismissed as a direct result of their political beliefs and activities, in violation of their Constitutional rights. The Coroner's office at this time elected to present no evidence in opposition to the political nature of the firings.

From this time forward began a series of tactics by both the plaintiffs and the defendants, particularly by counsel for the Coroner's office. These series of maneuverings consisted of a system of "jousting without horses and armor" and only verbally in time collisions and delays. One side would agree, the other side would disagree on any point and vice versa. This continued for quite a while until the matter was sent to another member of this court, where the same strategy continued. When the matter was returned to this court, I immediately ordered it for trial and finalization without further delay. I made findings in an opinion which I filed on August 23, 1985 and indicated that this matter was one in which politics had played a large part.

After judgment was entered, and after the Court of Appeals had affirmed, which took seven months, the matter was not yet settled, and the combat continued with the new participant, the County of Allegheny. The plaintiffs, in using what counsel considered to be their best judgment, issued execution against the personal property in the Coroner's office. The Coroner and the Coroner's Solicitor stayed away. The County of Allegheny became a defending party and claimed title to the personal property, as I have already recited in the narrative of this.

The "jousting" then continued between the County of Allegheny and the plaintiffs

as a sequel to the original "jousting" bouts that had been employed before judgment was entered by this court.

Now, the question arises for payment of attorneys' fees for all of the participants contesting, as I have enumerated them here. It would seem that much of the "jousting", while it was being caused by the adversary, may not have been properly exercised or responded to by the legal experts representing the plaintiffs.

Accordingly, in appraising the bill presented by the plaintiffs, I must evaluate it based upon the controlling legal authorities. The Civil Rights Act, 42 U.S.C. § 1988 provides:

"In any action or proceeding to enforce a provision of Sections 1981, 1982, 1983, 1985 and 1986 of this Title, Title IX of Public Law 92–318, or Title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

The action on behalf of the dismissed employees of the Coroner's office was instituted under 42 U.S.C. § 1983. Attorney's fees may be awarded to a prevailing party in any § 1983 action. *Maine v. Thiboutot,* 448 U.S. 1, 9, 100 S.Ct. 2502, 2506, 65 L.Ed.2d 555 (1980). In *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), the Supreme Court stated:

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and the rates claimed."

Judge Dolores K. Sloviter, a member of our Court of Appeals, was quoted in the Philadelphia Inquirer on August 23rd concerning the need for preserving the professionalism of the United States lawyers and instilling of confidence in them by the public who have been losing faith because of the activities of a minority number. She quoted the aftermath of a recent disaster at the Union Carbide plant in Bhopal, India, "when rival teams of American lawyers competed for clients while the hospitals were still filling up with the injured and dying".

She decried the competitiveness with which the members of the legal profession travelled 8,200 miles to Bhopal and "did little to better the American image in the Third World—or anywhere else". She also spoke of the criticism made by the American Bar Association Commission on Professionalism. She said, "Lawyers are sometimes blamed for clogging the courts, increasing the costs of litigation, contributing to the rise in the insurance rates and chasing doctors out of some specialties, such as obstetrics".

In her discussion she wisely alluded to the high earnings of lawyers and the starting salaries in New York which might have further damaged the good impression of the public regarding the professionalism of lawyers. But she very wisely stated, "One of the most unfortunate byproducts of the recent and critical publicity about members of the bar is that it has focused attention on the behavior of a small minority of the profession". She did not overlook the great services that lawyers perform by the countless hours and years of "pro bono work in the public interest", nor the sacrifices of time, money and careers of dedicated lawyers in the civil rights movement.

In the case of *Cunningham v. City of McKeesport,* 753 F.2d 262, (C.A. 3, 1985), the Court decided that the rate of pay was a factual matter which, when supported by appropriate affidavits and other competent evidence, stood as the base upon which the money amount was payable and left only the question for the presiding judge to determine from competent evidence the element of time involved for which fixed payment should be made.

In a dissenting opinion, Circuit Judge Adams Sur Denial Of Petition For Rehearing, joined in with Circuit Judges Hunter, Weis and Garth, at page 270:

"Both the judiciary and the public increasingly becoming concerned that a portion of the legal profession seems to be more interested in the subject of fees than in performing quality legal services. This perception, if left unchecked by careful judicial scrutiny, may threaten the viability of the counsel fee statute for legitimate social ends. The question of disproportionate attorney's fees is a matter sufficiently serious, I believe, to command the attention of the entire Court. Moreover, this proceeding might provide an opportune occasion for the Court to refine some important aspects of the *Lindy* rule. See *Lindy Brothers, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976) (in banc)."

The fixing of an attorney's fee by a presiding judge is not exactly a gratifying duty, but the determination is one of sworn duty with all the other obligations which a federal judge is bound to perform in good conscience to provide justice for all concerned.

Justice is "the principle of rectitude and just dealing of men with each other". *Lamborn & Co. v. United States*, 65 F.Supp. 569, 579, 106 Ct.Cl. 703 (1946). "Justice is the basis of society". *In re Charge to Grand Jury*, 5 McLean 306, F.Cas. No. 18,267 (1851). Simply, we know our justice to be fairness, fair play between persons. To deny justice to these plaintiffs, especially on the defenses and whims and evidence of the County of Allegheny, would be a mockery of justice. This we cannot allow, nor shall be.

Attorneys' fees should be considered in the light of the employer-employee relationship. Those who need legal services are the employers, and those who render the services are the employees who are bound to render necessary services to the satisfaction of the employer-clients.

Thus, the market place for legal services is no different from the market place for selling and acquiring commodities. But, not all commodities are alike; nor are all legal services alike. The artisan and the skilled serviceman produce the most desirable products and services which the market place must evaluate. We would not consider an apprentice's services of equal valuation to that of his master. In the legal sense, a law firm is the master and its individuals who perform the services are its employees, all the way from near apprentices who have just been admitted to the Bar, to the highly skilled practitioner before the court. It is appropriate that he must retain those who will perform his services for him in a legal capacity. He would have the right to charge for the actual payment which ought to be paid to the legal employee and also to make a profit for his services. To a certain extent, too, the employer must warrant or guarantee the services of his legal practitioners. And to a great extent, the reputation of the firm depends upon the accomplishments of his employee-attorneys.

LaFontaine is credited with the statement that "Help yourself, and heaven will help you". It should not appear so from an overabundance of aid by the court to the enhancement of attorneys'· fees. Presently, an applicable quotation for attorneys might be "Help yourself and the courts will help you". For, if we, the courts, do not concern ourselves with the interests of ordinary people and instead stand as an advocate for the enhancement of attorney's fees, it will prove that ordinary people will be left without counsel, or at the mercy of counsel and be compelled to become their own advocates. We should, in evaluating the liberal principle that attorneys are entitled to fees, be alert to, and restrict where possible, over-evaluation, self-love and self-enrichment through the aid of the courts. In the end, when it is through governmental channels, it is the public who must ultimately pay the bill.

In our experience in allowing attorneys' fees, we seldom see attorneys underrate themselves and very seldom see attorneys

underrate the value of their services, but the vast majority overrate themselves and require careful examination for the purpose of making payment truly for the services necessarily and well rendered.

The skills and efficiencies of lawyers are seldom disputed by impartial observers, even while there are many who bemoan the fact that lawyers these days are not the affordable, reliable, conscientious and productive lawyers of bygone days. Today, attitudes have changed more in favor of profit for lawyers, rather than to their beneficent and altruistic fulfillment of law. While law firms may believe it is appropriate to fix high charges for their non-experienced and incompetent young lawyers, the exorbitant level of their pay begins to shake the confidence of the public. It also begins to infringe upon what the law itself has always looked upon as monopolistic price fixing practices.

So, even if a law firm may act as a monopoly, to say that its amateurish lawyers can be sent in to try certain cases, and especially social security cases, which may not always be for the benefit of the client, strikes an antipathetic cord in legal practices.

But because of *Cunningham v. City of McKeesport, supra,* this court cannot perform a conscientious function entirely when it knows and sees that inexperienced lawyers have been given a crown of golden fees only because they are employed by certain law firms. Somehow justice seems to be lacking.

That Congress and the courts have graciously seen fit to aid justice by authorizing courts to impose the unjust costs of a disfavored litigant upon him and reimburse the successful litigant should evoke a spirit of cooperation in all lawyers in order to convince the public that the legal profession consists of truly honorable and trustworthy servants upon whom it relies.

The complaints against lawyers' demands for fees in the thousands of dollars strikes resentment in many people and eliminates legal help for those who are not eligible for legal aid and not necessarily the rich, but ordinary wage earners when they need such legal aid. The legal profession is an honorable profession and it can afford to have a more favorable reputation than it displays.

The plaintiffs are represented here by a Philadelphia law firm, three members of which contributed their services in procuring a judgment in favor of the plaintiffs, and a fourth who served in processing the enforcement of the judgment.

Our Court of Appeals had held in *Cunningham v. City of McKeesport, supra,* that where there is no conflict of evidence as to what a lawyer actually has charged former clients, the trial court remarkably has no discretion to adjust the hourly rate to be awarded. The Court said,

" ... we have consistently held that the lodestar calculation must be based on historical time charges for individual attorneys. What those charges are is a factual question". 753 F.2d at 268.

While plaintiffs' counsel have presented a chronological listing of services and time elements involved in each, they have not indicated that many of these services were not repetitious because of the number of members of the law firm who participated in them. According to a letterhead the firm consists of nineteen attorneys. The lawyers referred to in the details of services rendered are primary counsel, Alaine S. Williams; assistant counsel, Martha Walfoort and Nancy McCauley. The case was taken over at the last two hearings and arguments against the County of Allegheny by Attorney Allen Epstein.

Richard Kirschner, it appears is the head of the law firm, and evidently the members of his firm reported to him and consulted with him. He does not claim any fees for that service, but he did come to Pittsburgh and sat in with one member of his firm, but participated neither actively or verbally. For merely paying us a visit, I do not believe that the public should pay for his graciousness in visiting Pittsburgh. Therefore, I have considered the hours spent by those who carried the burden from the

beginning to the end, and in examining the details, I find it curious that there should be need of repetitious review of the files, and therefore have given this proper consideration in allocating attorneys' fees. Additionally, I find that many of the items were coupled together without any details to support the particulars for such services and those hours will be stricken.

Because of the case of *Cunningham v. City of McKeesport,* 753 F.2d 262 (C.A. 3, 1985), I do not undertake a detailed analysis of the fact that any of these attorneys were first year, second year, or how many years of experience they possess and the quality of rendered services which I am completely familiar with.

In determining the "lodestar", the number of compensable hours multiplied by the presumably reasonable hourly rate charged by the law firm, attributable to each defendant, I now evaluate the bill presented by the plaintiffs and make the following findings.

All reasonable attorneys' fees charged upon commencement of the action in March, 1981 until the employees were reinstated or offered reinstatement in 1982, shall be paid by the defendant, Sanford Edberg. According to the affidavits presented by the plaintiffs, and not opposed by counter affidavits, plaintiffs' counsel, Alaine S. Williams, has claimed 72 hours at an hourly rate of $75.00, for a total in 1981 of $5,400.00. After examining the time sheets submitted, recorded in 1/10th hour incriments, and the legal credentials of counsel, I find this application to be reasonable.

From January, 1982 until the mandate of the Court of Appeals, filed April 11, 1986, the plaintiffs' attorneys' fees are attributable to the presently constituted Coroner's office. During this time, the Coroner's office, although acknowledging the political nature of the firings, pursued a course of

attempting to delay and obstruct further proceedings through its discovery tactics, refusal to consummate settlement of this case, and refusal to stipulate that the initial hearing would be final for the purpose of trial. Even though it continuously recognized and admitted the plaintiffs' demand to be just, it followed this course of conduct, presenting no substantial evidence at trial, and even after judgment, by taking a frivolous appeal. With all of this Edberg had nothing to do and therefore cannot be chargeable with these recited particulars.

The fees claimed by the plaintiffs' counsel during this time begin with the 85.7 hours charged by Alaine S. Williams. After carefully reviewing the pleadings, briefs, memoranda and other materials, I am striking the time entries of June 25, 1984 (2 hours); June 27, 1984 (2 hours), and April 30, 1985 (2.5 hours) for the lack of any supports or explanations. I am striking as well the time entries of May 29, 1984 (.5 hours); June 11, 1984 (.5 hours); August 6, 1984 (1 hour); August 16, 1984 (1 hour); April 24, 1985 (.5 hours) and April 26, 1985 (3 hours) again for lack of support and specifics. Therefore, the hours for Alaine S. Williams from January, 1982 through September, 1985 total 72.7.

As for the other component of the lodestar, the reasonable hourly rate, that must be determined as the applicable rate in the local in which the attorney practices. *Cunningham v. City of McKeesport, supra,* at 272. Mrs. Williams was admitted to practice in Pennsylvania in 1980, and for lawyers with two to five years of experience, I determine a proper rate should be $90.00 per hour through the entire period of 1982 through 1985.[1] However, because of the *Cunningham* case, *supra,* the award for Mrs. Williams for this period shall be at the hourly rates her law firm charges for her services at $85.00 in 1982, $95.00 in 1983 and $105.00 in 1984 for a total of $7,343.50.

---

1. I have included my evaluation of a fair and reasonable hourly rate for counsel, although the discretionary opinion of the trial judge is irrelevant according to *Cunningham · v. City of McKeesport, supra.* However, should these evaluations subsequently become relevant, they may be accepted as findings of fact. See also, rate schedule, Court Awarded Fees, Report of the Third Circuit Task Force, October 5, 1985, Note 68.

Although Mrs. Williams devoted a large number of hours to "research" and "review of file" from 1981 through September, 1985 (those 16 hours do not even encompass drafting time), many additional hours have been billed by junior counsel, Martha Walfoort, during this period of time. Since 1983 was Attorney Walfoort's second year of practicing law, delegating some tasks to her should have been a more economical way of proceeding in this case. However, in the year 1983, Martha Walfoort expended an incredible 127.2 hours on this case which did not include any court time.

In examining and evaluating Walfoort's claim, I had not anticipated the large number of hours claimed for "Research" and "Review of File" regarding a case essentially controlled by two Supreme Court decisions. The 31 hours claimed for research and review are far too many (after allowing the primary counsel her claimed time for these activities), and therefore, I am reducing the hours claimed on July 5, 1983, August 6, 1983, August 17, 1983, August 25, 1983, August 26, 1983, September 1, 1983, September 6, 1983, September 14, 1983, October 14, 1983, October 19, 1983 and October 20, 1983 by 25% to 23.25 hours. The total of reasonable allowable hours to Walfoort, which are not duplicative, I find to be 120.95. To complete the lodestar, determining a reasonable hourly rate, I considered her relative lack of experience, the fact that she was primarily in the background performing fairly routine matters, and I therefore would have set her hourly rate for 1983 and 1984 at $80.00 per hour. However, since no evidence was presented to contradict that her firm did not actually charge $85 and $95 as hourly rates for her work (and that those billings are indeed paid), I am constrained to set the lodestar at those figures, for a total award for this attorney of $10,295.75.

It should be kept in mind through this evaluation that the maximum amount recoverable for these three plaintiffs was frozen throughout most of this litigation at approximately $30,000 at the time the employees were offered reinstatement. The 10 claimed hours for Richard Kirschner at $175.00 per hour must be evaluated in that light, and also must take into consideration the necessity for additional counsel (however expert he may be) in a case where trial counsel had performed so competently and diligently up to that point. After studying Mr. Kirschner's affidavit indicating that he is one of "the nation's foremost labor lawyers", the hourly rate may indeed be reasonable, however, I must strike the 10 hours as duplicative and not necessary.

I now turn to the second or "Supplemental Motion of Plaintiffs for the Award of Attorneys' Fees", dated April 10, 1986. This application encompasses the period from September 26, 1985 through March 27, 1986. These accumulated fees are also the responsibility of the presently constituted Coroner's Office. Some of these fees were generated by the application of the plaintiffs' counsel for attorneys' fees. Counsel may be awarded fees for time expended in the fee petition (or petitions) where the fee award is statutorily authorized. *David v. Scranton*, 633 F.2d 676, 677 (C.A. 3, 1980).

Alaine S. Williams has applied for a total of 25.7 hours of compensable time during this period for research, correspondence, telephone conversations, editing and drafting activities. The summary of activities, although not detailed, was not opposed by counter affidavits, and is not otherwise defective. Therefore, these hours will be allowed. A rate of $100.00 per hour would be a reasonable rate in the Eastern District of Pennsylvania for a lawyer who has been admitted to practice in this State for approximately five years, however, I am constrained to set the loadstar rates at her ever-increasing hourly rates of $115.00 in 1985 and $125.00 in 1986, for a total award of $3,165.50 for this period.

Apparently, the lawyer in the background Martha Walfoort was superceded during this time by a new background lawyer, Nancy J. McCauley. I believe that delegating responsibility to less senior counsel should result in savings to the client and in this case ultimately to the

public. Unfortunately, I do not believe that such savings have occurred here. However, since there is no discernable duplication in this fee application, I will allow the 26.9 hours. A fair and reasonable rate for this lawyer in practice less than five years, in an exclusively background or research role would be $80.00 per hour, but because of the lack of counter affidavits, I am constrained to set the second component of the loadstar at the hourly rate counsel apparently receives from the public, $85.00, for a total of $2,286.50.

I now turn to the "Second Supplemental Motion of Plaintiffs For the Award of Attorneys' Fees", dated July 22, 1986. All of the activities described therein involve the attempt of the plaintiffs to collect the judgment they were awarded in this court (which was affirmed by the Court of Appeals for the Third Circuit 787 F.2d 581).

All of the following costs shall be attributed to the County of Allegheny, who has taken every possible measure to see that the plaintiffs do not collect on their lawful judgment.

Responsibility for this case after April, 1986 was turned over from the very capable hands of Mrs. Williams to Alan B. Epstein of the same law firm. Mr. Epstein seemed to be unsure of which legal avenue he should follow to arrive at a final solution. After evaluating all the pleadings and memoranda submitted, as well as the time sheet summaries, I have determined reasonable attorneys' fees to be paid by the County of Allegheny.

I note initially that the format of recording fees of his firm apparently changed with the appearance of Attorney Epstein. Under the title "Preparation and Review ..." no dates are recorded making this part of the claim suspect. After studying further the "Memorandum Contra Claim of Allegheny County", I determine that the number of reasonable hours for this eight-page document, with appendices, shall be reduced to ten, making the total number of

reasonable, allowable hours under this title to be 15.7.

Under the title "Telephone Conferences" the items are dated and reasonable at 1.3 hours. Additionally, under the title "Meetings, Conferences and Hearings", the dated entries appear to be reasonable at 20 hours.

The time claimed by Epstein for correspondence, 1.4 hours, and the time for court hearings, 5 hours, appear to be reasonable, according to court records. Finally, the time for preparation of a fee petition, 3.5 hours is allowable as previously discussed, and the costs are recoverable as well.

Determining the second component of the lodestar, the reasonable hourly rate for Epstein must begin with his claim of $150.00 per hour and his affidavit in support thereof. I would hesitate to award an hourly rate greater than the rate assigned to Mrs. Williams. Taking into consideration the ten years' experience of counsel, the hourly rate of $125.00 would be reasonable. However, the question of fact of his customary hourly fee was not raised, therefore, I am constrained to award $7,035.00 for his counsel fees.

In summary, the fees to be awarded to counsel from the commencement of this action until July 22, 1986 shall be:
To be paid by defendant, Sanford Edberg:
$5,400.00 for Alaine S. Williams;
To be paid by Coroner of Allegheny County:
$10,508.00 for Alaine S. Williams,
$10,295.75 for Martha Walfoort,
$ 2,286.50 for Nancy J. McCauley,
for a total of $23,090.25
To be paid by the County of Allegheny:
$7,035.00 for Alan B. Epstein.
Out of $40,315.00 requested in fees and costs, $35,525.25 is hereby granted. Costs of $680.00 are hereby granted.[2]

**2.** No adjustments have been made to the lodestar as there was no evidence from the plaintiffs that this was an example of "rate case" in which

an enhancing or diminishing multiplier would be appropriate. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1548–1549, 79 L.Ed.2d 891

I am mindful of what the Supreme Court said in *Hensley v. Eckerhart, supra,* 461 U.S. at page 434, 103 S.Ct. at page 1939, "The district court also should exclude from this initial fee calculation hours that were not 'reasonably expended.' S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers very widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary ..."

I have attempted to follow the instruction by the Supreme Court and will be mindful of *Cunningham v. City of McKeesport, supra.*

Counsel for the County of Allegheny at the subsequent argument and hearing of this case asserted in open court, in effect, that the judgment of this court ought not to be honored, and in effect that it had no value. To accept this attitude of a public servant whose duty it is to preserve public assets and to apply them for the use of the public strikes no sympathetic cord of this court of justice. The injustice of this attitude of counsel for the County lies in the facts that without approval or disapproval by the County Commissioners, counsel is asserting that the salaries of the three employees of the public in the Coroner's office, who had worked for the people in the Coroner's service, should not be honored even though the salaries had placed upon them the stamp of legality by two Federal courts; that the County of Allegheny had a perfect right to take all the funds collected by the Coroner and credit them for the use of the County in all of its functions; that the Coroner's legal debts, as in this case, should not be paid because there was no approval in the ordinary course of business by the County, when no reason had been given for their failure to order payment; and that the County had the right to take all the revenue of the Coroner's office and give nothing to those who gave to the Coroner's office their services as a public function—as the County wished to do without any reason at all.

It would appear that counsel for the County failed to perform their legal duty when they did not inform the County Commissioners that these debts of the Coroner's office for the salaries of employees in that office had been legalized and required honoring by the County Commissioners. Their failure to do so raised a barrier to the federal court's functioning and was and is out of order.[3]

Counsel for the County, the County Commissioners and all the administrative officers are bound by the judgment of this court and it is counsels' duties to so inform their clients. No further delay will be sanctioned, and while the delaying defense under the facts of this case might be considered as a reason for imposing legal sanctions upon counsel as part of the already over-burdened delay costs incurred in the honoring of the judgment of this court, there shall nevertheless be no further delay of justice to the Coroner's employees.

Thus, it is that while I allude to the risk which lawyers have placed themselves in the confidence of the public in their professionalism, I do not condemn any lawyers in this case or imply, nor intend to imply, that any attorney in this case has been or shown to be dishonest in any way whatsoever. But, wherever applicable in any case, speedy, reliable service should be rendered by skilled, earnest, trustworthy attorneys, not necessarily in altruistic fashion, but with a reasonableness of fee charging, as will instill confidence and respect in the public. This is more necessary now that reasonable attorneys' fees in certain cases are given support by Congress and the courts. Let it not be said of the legal

---

(1984). Also, no downward adjustment to the lodestar is permissible proportionate to the small amount of damages. *Riverside v. Rivers,* —— U.S. ——, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986).

**3.** The failure to show that the County Commissioners approved counsel's action, in itself might induce a court to impose costs upon counsel who so delay the judgment of a federal court.

profession that it is falling into the ways of some medical practitioners because of governmental enrichments.

Judgments will be entered upon this declaration of facts and law to mandatorily direct the County of Allegheny to pay to the plaintiffs the full amount of the judgment entered on August 23, 1985, which was $29,196.94, with interest, and further to pay to the plaintiffs attorneys' fees as the further indebtedness of the Coroner's office, in the following amounts:

$10,508.00 for Alaine S. Williams,

$10,295.75 for Martha Walfoort,

$ 2,286.50 for Nancy J. McCauley, and

$ 7,035.00 for Alan B. Epstein, as Allegheny County's own obligation,

for a TOTAL OF $30,125.25;

and further, the defendant, Sanford Edberg, is ordered to pay $5,400.00 to the plaintiffs in attorneys' fees.

The Findings of Fact and Conclusions of Law are incorporated in this Opinion in accordance with Federal Rule of Civil Procedure No. 52.[4]

## ORDER OF COURT

AND NOW, TO-WIT, this 18th day of September 1986, in accordance with the foregoing Opinion, IT IS HEREBY ORDERED that the County of Allegheny assume its lawful and official liabilities as set forth herein, forthwith, and pay to the plaintiffs the amount of the final judgment entered by this court on August 23, 1985, in the amount of $29,196.94 with interest, together with attorneys' fees attributable and allottable to the County of Allegheny in the amount of $30,125.25, as set forth in the foregoing Opinion.

IT IS FURTHER ORDERED that a supplemental judgment be and is hereby entered for the plaintiffs against Sanford Edberg in the amount of $5,400.00 for attorneys' fees as set forth in the foregoing Opinion.

**4.** Rule 52. Findings by the Court.
(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially or state sepa-

## CLARIFICATION

The Order of Court of September 18th, 1986 should not be construed to have relieved or released Sanford Edberg as a co-obligor with the Coroner's office for the payment of the judgment entered August 23rd, 1985, in favor of the plaintiffs. The co-obligation has continued even though the County of Allegheny has been mandated to pay the legal obligation and judgment against the Coroner's office.

rately its conclusions of law thereon ... If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.